# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| A.D. an individual, | Case No.: 2:22-cv-00095-JES-NPM |
| Plaintiff, | FIRST AMENDED COMPLAINT |
| vs. | DEMAND FOR JURY TRIAL |
| CAVALIER MERGERSUB LP F/K/A COREPOINT LODGING, INC.; CPLG WELLESLEY PROPERTIES, LLC F/K/A BRE/WELLESLEY PROPERTIES, LLC; CPLG FL PROPERTIES, LLC F/K/A LQ FL PROPERTIES; LA QUINTA HOLDINGS, INC.; LQ MANAGEMENT L.L.C.; LA QUINTA FRANCHISING LLC; BONITA SPRINGS HOTEL 1, LLC F/K/A BONITA SPRINGS HOTEL, LLC; WYNDHAM HOTELS & RESORTS, INC.; QUORUM HOTELS & RESORTS, LTD.; CHOICE HOTELS INTERNATIONAL, INC.; R&M REAL ESTATE COMPANY, INC.; TAMPA BAY HOTELS, LLC; ROBERT VOCISANO AND MARIO VOCISANO; BEST WESTERN INTERNATIONAL, INC.; APEX HOSPITALITY, LLLP; MARRIOTT INTERNATIONAL, INC., CHMB FLORIDA HOTEL MANAGER, LLC; CHM NAPLES II HOTEL PARTNERS, INC.; and HOLISTIC HEALTH HEALING, INC., | |
| Defendant(s). | |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff A.D. ("Plaintiff" or "A.D."), by and through the undersigned counsel, and respectfully submits her first amended complaint for damages and makes the following averments.

## INTRODUCTION

1. For decades, criminal sex traffickers have brazenly operated in and out of hotels

throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the expense of human life, human rights, and human dignity.

2.     At all times relevant to this complaint, Defendants La Quinta Holdings, Inc.; LQ Management L.L.C.; La Quinta Franchising LLC and their successor entities, Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc. and Wyndham Hotels & Resorts, Inc. ("La Quinta Defendants" or "LQ Defendants") benefited from owning, managing, and operating two hotels where Plaintiff alleges injuries related to her sex trafficking occurred. These La Quinta Defendants that act in unison and together are responsible for Plaintiff's injuries at the following two (2) La Quinta hotel locations:

      a.  The real property known as La Quinta Inn® Naples Downtown and located at 1555 5th Avenue, Naples, Florida 34102, is owned by CPLG Wellesley Properties, LLC f/k/a BRE/Wellesley Properties, LLC;

      b.  The real property known as La Quinta Inn® and located at 4730 West Spruce Street, Tampa, Florida 33607, is owned by CPLG FL Properties, L.L.C. f/k/a LQ FL Properties;

3.     Defendant Wyndham Hotels & Resorts, Inc. ("Wyndham") flies its flag and sets standards at one additional hotel property, a Wyndham Gardens, where Wyndham shares decisions with Defendant Quorum Hotel & Resorts, Ltd.:

      a.  The real property known as a Wyndham Tampa Westshore, located at 700 N. Westshore Blvd., Tampa, Florida 33609, is owned by Quorum Hotel & Resorts,

Ltd.

4.     Defendants Robert Vocisano and Mario Vocisano, who also own and operate R&M Real Estate Company, Inc. own the real property and share in management decisions at two (2) hotels where A.D. was trafficked. Together with the branded hotel defendants, Best Western International, Inc. and Choice Hotels International, Inc., Robert Vocisano and Mario Vocisano, and R&M Real Estate Company are responsible for Plaintiff's injuries at the following hotels:

a.     Best Western Naples Plaza hotel located at 6400 Dudley Drive, Naples, Florida 34105, which is a Best Western International, Inc. branded hotel;

b.     Quality Inn & Suites Golf Resort hotel located at 4100 Golden Gate Parkway, Naples, Florida 34116, which is a Choice Hotels International, Inc. branded hotel.

5.     Defendant Choice Hotels International, Inc. ("Choice") flies its flag and sets standards at one additional hotel property, a Comfort Suites, where Choice shares decisions with Defendant Tampa Bay Hotels, LLC:

a.     The real property known as a Comfort Suites at Fairgrounds Casino ("Comfort Suites") located at 4506 Oak Fair Boulevard, Tampa, Florida 33610.

6.     Defendant Best Western International, Inc. ("Best Western" or "BWI") also flies its flag and sets standards at an additional hotel property, a Best Western Inn & Suites, where Best Western shares decisions with Defendant Apex Hospitality, LLLP:

a.     The real property known as a Best Western® Fort Myers Inn & Suites hotel located at 4400 Ford Street, Fort Myers, Florida 33916.

7.     Defendant Best Western International, Inc. ("Best Western") owned, operated, and set standards at the formerly branded Best Western® Bonita Springs Hotel where Plaintiff A.D. was trafficked. The hotel is currently a Days Inn & Suites by Wyndham Bonita Springs North Naples,

but at all relevant times Defendant Best Western shared decisions with the real property owner, Defendant Bonita Springs Hotel 1, LLC f/k/a Bonita Springs Hotel, LLC, who is still making decisions for the Days Inn & Suites with Defendant Wyndham.  It is located at 27991 Oakland Drive, Bonita Springs, Florida 34135.

8.     At all times relevant to this complaint Defendants Marriott International, Inc.; CHMB Florida Hotel Manager, LLC; CHM Naples II Hotel Partners, Inc. ("Marriott Defendants") benefited from owning, managing, and operating two properties where Plaintiff alleges injuries related to her sex trafficking occurred. These Marriott Defendants that act in unison and together are responsible for Plaintiff's injuries at the following three Marriott hotel locations:

    a.  The real property known as the Fairfield Inn® & Suites Naples located at 3804 White Lake Boulevard, Naples, Florida 34117 is owned by CHMB Florida Hotel Manager, LLC.

    b.  The real property known as the SpringHill Suites® by Marriott Naples located at 3798 White Lake Boulevard, Naples, Florida 34117 is owned by CHM Naples II Hotel Partners, LLC.

9.     Holistic Health Healing, Inc. owns and operates the property and manages the business known as Conty's Motel located at 11238 Tamiami Trail E, Naples, Florida 34113, where Plaintiff alleges injuries related to her sex trafficking occurred.

10.    All Defendants know and have known for decades that sex trafficking repeatedly occurs at their respective locations and under their flags throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendants have instead chosen to ignore and thereby facilitate commercial sex trafficking on their properties, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making

no attempt to raise awareness or put an end to the repeated abuses of victims at their properties.

11. This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

12. A.D. was trafficked for commercial sex in Hillsborough, Lee, and Collier Counties in Florida. A.D. was sold via commercial sex transactions at the Defendants' hotel properties, where force, fraud, and coercion were used against her, while Defendants turned a blind eye and continued to benefit.

13. A.D. was advertised for sex on various websites known for trafficking, whereby Defendants provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of A.D. for the purpose of sex trafficking.

14. Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for A.D. to be sold repeatedly to buyers who frequented the Defendants' hotel properties to purchase victims of sex trafficking, including A.D.

15. With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel properties, A.D. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotels.

16. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Defendants who, motivated by profits and the value of the "good will" of their brand, refused to institute meaningful steps to stop trafficking, and instead continued to operate a venture which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and

victimization of A.D. for their own benefit.

17.     The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be engaging in sex trafficking in violation of the TVPRA.  Defendants turned a blind-eye to more than a decade of direct knowledge regarding anti-trafficking efforts and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

**PARTIES**

18.     Plaintiff A.D. is a natural person who resides in Collier County, Florida.

     a.  Plaintiff A.D. was living at home with her parents, fully employed and enrolled in college when she was first beckoned to a hotel where she was fraudulently induced, coerced and sexually assaulted before being sold for the purposes of commercial sex throughout Hillsborough, Collier, and Lee Counties. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (16).

     b.  Due to the sensitive, private, and potentially retaliatory nature of the allegations, Plaintiff A.D. requests that this Court grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter. [1]

     c.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure. of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

    d.   Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape and commercial sex trafficking. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

    e.   In order to maintain her privacy and safety, Plaintiff should not be compelled to disclose her identity. Plaintiff's privacy and safety interests substantially outweigh the customary practice of judicial openness.[5]

    f.   Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

---

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Stegall,* 653 F.2d at 186 (5th Cir. 1981); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Supra* n. 1 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

19.     Defendant Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc ("CPLG"), is a publicly traded company that was a spin-off from La Quinta Holdings ("LQH") when LQH sold its franchising and management businesses to Wyndham Worldwide Corporation ("Wyndham Hotels & Resorts, Inc." or "Wyndham") in 2018.

a.  Defendant Cavalier MergerSub LP became the successor entity to CorePoint Lodging, Inc. ("CPLG"). Defendant Cavalier MergerSub LP retains successor liability for wrongful acts of its predecessor CPLG.

b.  Defendant CPLG became one of the successor entities to La Quinta Holdings, Inc. ("LQH") when LQH underwent a corporate spin-off into two separate companies: CPLG and Wyndham. Defendant CPLG, retains successor liability for wrongful acts of its predecessor LQH.

c.  CPLG maintained the same headquarters, management, employees, and real estate properties as LQH.

d.  CPLG continued to hold the real property for La Quinta® branded hotels, while continuing to make key management, financial and operating decisions for La Quinta branded properties alongside Defendant Wyndham. CPLG headquarters are at 909 Hidden Ridge, Suite 600, Irving, Texas 75038.

e.  Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc. ("CPLG")is a Delaware corporation which owns, maintains and profits from the hotel properties where Plaintiff was trafficked: La Quinta Inn® Naples Downtown and La Quinta Inn® Tampa Bay Airport.  Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc. can be served by its registered agent Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

f. Defendant CPLG is and was involved in the operations and management of the La Quinta Inn® Naples Downtown and La Quinta Inn® Tampa Bay Airport, where the Plaintiff was trafficked for commercial sex.

20. Defendant CPLG Wellesley Properties, LLC f/k/a BRE/Wellesley Properties, LLC ("CPLG Wellesley"), doing business as the La Quinta Inn® Naples Downtown ("La Quinta Naples Downtown"), is a limited liability company. Defendant CPLG Wellesley is a subsidiary of CorePoint Lodging, Inc. CPLG Wellesley was involved in the operation and management of the La Quinta® located at 1555 5th Avenue, Naples, Florida 34102 where the Plaintiff was trafficked for commercial sex. Through its relationship with other LQ Defendants and the perpetrators who trafficked A.D. at the La Quinta Inn Naples Downtown, Defendant CPLG Wellesley knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant CPLG Wellesley may be served with service of process by serving its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee, Florida 32301.

21. Defendant CPLG FL Properties, LLC f/k/a LQ FL Properties, ("CPLG FL") doing business as the La Quinta Inn® Tampa Bay Airport ("La Quinta Tampa Bay Airport"), is a limited liability company. CPLG FL is a subsidiary of CorePoint Lodging, Inc. Defendant CPLG FL was involved in the operation and management of the La Quinta Inn® located at 4730 West Spruce Street, Tampa, Florida 33607 where the Plaintiff was trafficked for sex. Through Defendant CPLG, and the perpetrators who trafficked A.D. at the La Quinta Tampa Bay Airport, Defendant CPLG FL knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant CPLG FL may be served with service of process by serving its registered agent, Corporation Service

Company, at 1201 Hays Street, Tallahassee, Florida 32301.

    a. CPLG, through its relationship with the Defendants La Quinta Holdings ("LQH"), La Quinta Franchising LLC ("LQF"), LQ Management L.L.C. ("LQM"), Wyndham Hotels and Resorts ("Wyndham"), CPLG Wellesley, CPLG FL Properties, and the perpetrators who trafficked A.D. at the La Quinta hotels, knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

    b. Defendant CPLG's headquarters are at 909 Hidden Ridge, Suite 600, Irving, Texas 75038 and the corporation may be served with service of process by serving its registered agent, CSC-Lawyers Incorporating Service, Company, at 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

22. During the trafficking period Defendant La Quinta Holdings, Inc. ("LQH") was a large publicly traded hotel brand consisting of La Quinta real estate holdings, La Quinta Franchising LLC ("LQF") and LQ Management L.L.C. ("LQM"). Prior to the spinoff into CPLG in 2018, LQH was a publicly traded Delaware corporation. LQH can be served by its registered agent, Corporate Creations Network Inc., at 3411 Silverside Road – Tatnall Building, Suite 104, Wilmington, Delaware 19810.

    a. During the trafficking period, Defendant LQ Management L.L.C. was a wholly owned subsidiary of La Quinta Holdings, and was a Texas corporation located at 909 Hidden Ridge, Suite 600, Irving, Texas 75038. LQM is now headquartered at 22 Sylvan Way, Parsippany, New Jersey 07054 and can be served by its registered agent Corporate Creations Network Inc., at 3411 Silverside Road –

Tatnall Building, Suite 104, Wilmington, Delaware 19810.

b. During the trafficking period, Defendant La Quinta Franchising LLC was a wholly owned subsidiary of LQH, and was a Texas corporation located at 909 Hidden Ridge, Suite 600, Irving, Texas 75038. LQF is and always has been a Nevada limited liability corporation. La Quinta Franchising LLC is currently headquartered at 22 Sylvan Way, Parsippany, New Jersey 07054 and can be served by its registered agent Corporate Creations Network Inc., at 8275 Southeastern Avenue #200, Las Vegas, Nevada 89123.

c. During the period of trafficking LQH, together with its fully owned subsidiaries, LQM and LQF conducted and operated businesses throughout the state of Florida. In 2018, LQH conducted a spinoff becoming CPLG and selling the La Quinta® brand, including LQF and LQM to Defendant Wyndham. LQH created CPLG to hold real estate, however, upon information and belief, CPLG did not passively hold La Quinta® branded real estate, but continued to make critical management and business decisions for the La Quinta® branded properties it held an interest in.

d. For the reasons outlined above the "La Quinta Defendants" include LQH, LQM, LQF, CPLG, CPLG Wellesley, CPLG FL Properties and Wyndham.

e. La Quinta Inn® by Wyndham Tampa Bay Airport ("La Quinta Tampa Bay Airport") is a former LQH property, currently owned, operated and managed by Defendants CPLG and Wyndham. During the trafficking period La Quinta Defendants owned, supervised, and/or operated the La Quinta hotel located at 4730 West Spruce Street, Tampa, Florida 33607.

f. La Quinta Inn® by Wyndham Naples Downtown ("La Quinta Naples Downtown") is an LQH brand property. During the trafficking period, La Quinta Defendants owned, supervised, and/or operated the La Quinta hotel located at 1555 5th Avenue, Naples, Florida 34102.

g. The La Quinta Inn® brand operates in forty-nine (49) states. The brand's assets are strategically located throughout the United States – close to amusement parks, airports, freeways, and other thoroughfares and the majority of these properties are currently owned and managed by Defendants CPLG, Wyndham, as well as LQF and LQM.

h. During the trafficking period La Quinta Defendants conducted and operated businesses throughout the state of Florida, and La Quinta Defendants still in business continue to conduct and operate businesses through the state of Florida.

i. The La Quinta Defendants are subject to the jurisdiction of this Court because they regularly conduct business in the State of Florida; derive substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the La Quinta hotels; have caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at their hotels.

j. The La Quinta Defendants are the principal in an agency relationship with the La Quinta hotels. In addition to the La Quinta Defendants' liability under TVPRA section 1595, the La Quinta Defendants are vicariously liable for the acts and/or omissions of the staff at their La Quinta hotels and all of their franchisee hotels.

k. The La Quinta hotels where A.D. was trafficked have apparent agency for the La

Quinta Defendants so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

l. The La Quinta Defendants have ratified the actions and inactions of the La Quinta branded hotels.

m. The La Quinta Defendants exercise day-to-day control over the La Quinta branded hotels through their brand standards and retain control over the La Quinta branded hotels under the terms of their franchise agreement.

n. As an integrated enterprise and/or joint employer, Defendants, including the La Quinta Defendants, are separately and jointly responsible for compliance with all applicable laws.

o. As an integrated enterprise and/or joint employer, Defendants, including the La Quinta Defendants, are jointly and severally liable for any damages caused by their employees.

p. As the principal and as a hotel operator, the La Quinta Defendants control the training, policies, and decisions on implementation and execution of policy for its branded properties, including the La Quinta hotels where Plaintiff was trafficked.

q. The La Quinta Defendants maintain that they consider guest safety and security to be important and require the hotels in their portfolio to comply with La Quinta brand standards and all local, state, and federal laws.

r. Upon information and belief, the La Quinta Defendants control a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human

trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by the La Quinta Defendants, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the La Quinta Inn® hotel where A.D. was trafficked.

s.  Through the La Quinta Defendants' relationship with the staff at the La Quinta Inn® hotels where A.D. was trafficked and where A.D.'s traffickers were guests or visitors, the La Quinta Defendants knowingly benefited, or received something of value, from their participation in a venture which they knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which the La Quinta Defendants are entitled to under the franchise agreements.

t.  The La Quinta Defendants benefited financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

u.  The La Quinta Defendants have benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

23.  Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It is headquartered at 1 Sylvan Way, Parsippany, New Jersey 07054. Wyndham Hotels and Resorts,

Inc. is a Delaware corporation and can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a. Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains successor liability for wrongful acts of its predecessor, Wyndham Worldwide Corporation.

b. Defendant Wyndham purchased La Quinta's management (LQM) and franchise (LQF) businesses in 2018 from LQH. Defendant Wyndham Hotels & Resorts, Inc. and Defendant CPLG are the successor entities to La Quinta Holdings, Inc. ("LQH"). Defendant Wyndham retains successor liability for wrongful acts of its predecessor LQH.

c. Defendant Wyndham, in conjunction with the La Quinta Defendants, owned, supervised, and/or operated the La Quinta Inn & Suites® by Wyndham Naples Downtown ("La Quinta Naples Downtown") located at 1555 5th Avenue, Naples, Florida 34102 and the La Quinta Tampa Airport ("La Quinta Tampa Bay Airport") located at 4730 West Spruce Street, Tampa, Florida 33607 where A.D. was trafficked. Collectively, the La Quinta Naples Downtown and the La Quinta Tampa Bay Airport may be referred to as the "La Quinta hotels."

d. Defendant Wyndham, in conjunction with the La Quinta Defendants, conducts and operates business throughout the state of Florida.

e. Defendant Wyndham, in conjunction with the La Quinta Defendants, are subject to the jurisdiction of this Court because they regularly conduct business in the State of Florida; derive substantial revenue from services rendered in Florida,

including through the operation of numerous hotels in Florida; has caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at its hotels.

f. Defendant Wyndham, in conjunction with the La Quinta Defendants, are the principals in an agency relationship with the La Quinta hotels. In addition to Wyndham and the La Quinta Defendants' liability under TVPRA Section 1595, Wyndham and the La Quinta Defendants are vicariously liable for the acts and/or omissions of the staff at its La Quinta properties.

g. The La Quinta hotels where A.D. was trafficked have apparent agency for Defendant Wyndham, including La Quinta Defendants, so as to establish vicarious liability under Florida law, in addition to actual agency relationships.

h. Defendant Wyndham, including La Quinta Defendants, ratified the actions and inactions of La Quinta hotels.

i. Defendant Wyndham, including La Quinta Defendants, exercise day-to-day control over La Quinta hotels through its brand standards and retain control over La Quinta properties under the terms of its operating and franchise agreements.

j. Defendant Wyndham, including La Quinta Defendants, and the La Quinta hotels are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the La Quinta hotels where the Plaintiff was trafficked for sex. Defendant Wyndham, including La Quinta Defendants, and the La Quinta properties each share the common policies and practices complained of herein.

k. Defendant Wyndham, including La Quinta Defendants, jointly employ or ratify

16

the employment of individuals through horizontal joint employment and/or vertical joint employment at the La Quinta properties.

l. As an integrated enterprise and/or joint employer, Defendant Wyndham, including La Quinta Defendants, are separately and jointly responsible for compliance with all applicable laws that apply to the La Quinta properties.

m. As an integrated enterprise and/or joint employer, Defendant Wyndham, including La Quinta Defendants, are jointly and severally liable for any damages caused by employees of the La Quinta hotels.

n. As the principal and as a hotel operator, La Quinta Defendants, including Defendant Wyndham, controls the training, policies, and decisions on implementation and execution of policy for its La Quinta properties, including the La Quinta hotels where Plaintiff was trafficked.

o. Defendant Wyndham, including the La Quinta Defendants, maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with La Quinta® and Wyndham brand standards and all local, state, and federal laws.

p. Upon information and belief, the Defendant Wyndham, including La Quinta Defendants, control and benefit from a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Defendant Wyndham, including La Quinta

Defendants, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the La Quinta hotels where A.D. was trafficked.

q. Through the La Quinta Defendants' relationship with the staff at the the La Quinta Inn hotels where A.D. was trafficked and where A.D.'s traffickers were guests or visitors, La Quinta Defendants, including Defendant Wyndham, knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which La Quinta Defendants, including Wyndham, are entitled to under operating and franchise agreements.

r. Defendant Wyndham, in conjunction with the La Quinta Defendants, benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was commercially sex trafficked.

s. Defendant Wyndham, in conjunction with the La Quinta Defendants, has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

t. Wyndham has successor liability for the supervision and/or operation of the La Quinta® located at 1555 5th Avenue, Naples, Florida 34102.

u. Wyndham has successor liability for the supervision and/or operation of the La Quinta hotel located at 4730 West Spruce Street, Tampa, Florida 33607.

24. Defendant Wyndham's operations span across the globe, so it is no surprise that Plaintiff A.D. was trafficked at an additional Wyndham property.

a. Defendant Wyndham owned, supervised, and/or operated the Wyndham® Tampa Westshore ("Wyndham Tampa Westshore") hotel located at 700 N. Westshore Blvd., Tampa, Florida 33609, where A.D. was trafficked.

b. As stated previously, Defendant Wyndham conducts and operates business throughout the state of Florida.

c. As stated previously, Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Wyndham branded hotels; has caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at its hotels.

d. Wyndham is the principal in an agency relationship with the Wyndham Tampa Westshore. In addition to Wyndham's liability under TVPRA Section 1595, Wyndham is vicariously liable for the acts and/or omissions of the staff at its Wyndham Tampa Westshore and all of its franchisee hotels.

e. The Wyndham Tampa Westshore where A.D. was trafficked have apparent agency for Wyndham so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

f. Wyndham has ratified the actions and inactions of the Wyndham Tampa

Westshore.

g. Wyndham exercises day-to-day control over the Wyndham Tampa Westshore through its brand standards and retains control over the Wyndham Tampa Westshore property under the terms of its operation and franchise agreements.

h. Defendant Wyndham and the Wyndham Tampa Westshore is a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Wyndham Tampa Westshore where the Plaintiff was trafficked for commercial sex acts. Defendant Wyndham and the Wyndham Tampa Westshore, each share the common policies and practices complained of herein.

i. Defendant Wyndham and the Wyndham Tampa Westshore jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

j. As an integrated enterprise and/or joint employer, Defendant Wyndham and Wyndham Tampa Westshore are separately and jointly responsible for compliance with all applicable laws.

k. As an integrated enterprise and/or joint employer, Defendant Wyndham and Wyndham Tampa Westshore are jointly and severally liable for any damages caused by their employees.

l. As the principal and as a hotel operator, Defendant Wyndham controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Wyndham Tampa Westshore where Plaintiff was trafficked.

m. Defendant Wyndham maintains that it considers guest safety and security to be

important and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.

n.  Upon information and belief, Defendant Wyndham controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Wyndham Tampa Westshore where Plaintiff was trafficked.

o.  Through Wyndham's relationship with the staff at the Wyndham Tampa Westshore where Plaintiff was trafficked and where traffickers of Plaintiff were guests or visitors, Wyndham knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which Wyndham is entitled to under operation and franchise agreements.

p.  Wyndham benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was commercially sex trafficked.

q. Wyndham has benefited by turning a blind eye to rampant commercial sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their branded hotels.

25. Defendant Quorum Hotel & Resorts, Ltd. ("Quorum"), doing business as the Wyndham® Westshore ("Wyndham Tampa Westshore"), is a Florida domestic limited partnership and is one of Defendant Wyndham's branded properties. Defendant Quorum was involved in the staffing and operation of the Wyndham Tampa Westshore located at 700 N. Westshore Blvd., Tampa, Florida 33609, where the Plaintiff was trafficked for sex. Through its relationship with Defendant Wyndham and the perpetrators who trafficked A.D. at the Wyndham Tampa Westshore, Defendant Quorum knowingly benefited or received something of value from operating a venture which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of A.D. for their own benefit. Defendant Quorum may be served with service of process by serving its registered agent, W. A. Farris c/o Chase Hotel Company, at 5429 LBJ Freeway, Suite 625, Dallas, Texas 75240.

26. Defendant Choice Hotels International, Inc., ("Choice" or "Choice Hotels") is one of the largest hotel brands in the world with approximately 7,000 branded properties in more than forty (40) countries and territories. It is a Delaware corporation and can be served by its registered agent, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

a. Choice Hotels owned, supervised, and/or operated the Comfort Inn & Executive Suites® Naples ("Comfort Inn") located at 3860 Tollgate Boulevard, Naples, Florida 34114.

b. Choice Hotels owned, supervised, and/or operated the Comfort Suites® at Fairgrounds Casino ("Comfort Suites") located at 4506 Oak Fair Boulevard,

Tampa, Florida 33610.

c. Choice Hotels owned, supervised, and/or operated the Quality Inn & Suites® Golf Resort ("Quality Inn") located at 4100 Golden Gate Parkway, Naples, Florida 34116.

d. Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® are all Choice Hotels brands.

e. Defendant Choice conducts and operates business throughout the state of Florida.

f. Choice is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Quality Inn, Comfort Inn, and Comfort Suites hotels; has caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at its hotels.

g. Choice is the principal in an agency relationship with the Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels. In addition to Choice's liability under TVPRA section 1595, Choice is vicariously liable for the acts and/or omissions of the staff at its Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels and all of its franchisee hotels.

h. The Comfort Inn, Comfort Suites, and Quality Inn hotels where A.D. was trafficked have apparent agency for Choice so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

i. Choice has ratified the actions and inactions of the Comfort Inn & Executive

23

Suites®, Comfort Suites®, and Quality Inn & Suites® hotels.

j. Choice exercises day-to-day control over the Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels through its brand standards and retains control over the Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels under the terms of its franchise agreement.

k. Defendant Choice, Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels where the Plaintiff was trafficked for sex. Defendant Choice, Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® each share the common policies and practices complained of herein.

l. Defendant Choice, Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

m. As an integrated enterprise and/or joint employer, Defendant Choice, Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® are separately and jointly responsible for compliance with all applicable laws.

n. As an integrated enterprise and/or joint employer, Defendant Choice, Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® are jointly and severally liable for any damages caused by their employees.

o. As the principal and as a hotel operator, Defendant Choice controls the training, policies, and decisions on implementation and execution of policy for its branded

properties, including the Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels where Plaintiff was trafficked.

p. Defendant Choice maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Choice Hotels brand standards and all local, state, and federal laws.

q. Upon information and belief, Defendant Choice controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Choice, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels where Plaintiff was trafficked.

r. Through Choice's relationship with the staff at the Comfort Inn & Executive Suites®, Comfort Suites®, and Quality Inn & Suites® hotels where A.D. was trafficked and where traffickers of Plaintiff were guests or visitors, Choice knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room

revenue which Choice is entitled to under the franchise agreements

    s. Defendant Choice benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

    t. Choice has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

27. Defendant R&M Real Estate Company, Inc. ("R&M"), doing business as the Comfort Inn & Executive Suites® Naples ("Comfort Inn Naples"), is a Florida domestic profit corporation and is one of Defendant Choice's branded properties. Defendant R&M was involved in the staffing and operation of the Comfort Inn hotel located at 3860 Tollgate Boulevard, Naples, Florida 34114 where the Plaintiff was trafficked for sex. Through its relationship with Defendant Choice and the perpetrators who trafficked A.D. at the Comfort Inn Naples, Defendant R&M knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant R&M may be served with service of process by serving its registered agent, Sharon K. Romer at 4100 Golden Gate Parkway, Naples, Florida 34116.

28. Defendant Tampa Bay Hotels, LLC ("Tampa Bay Hotels"), doing business as the Comfort Suites® at Fairgrounds Casino ("Comfort Suites Fairgrounds Casino"), is a Florida limited liability company and is one of Defendant Choice's branded properties. Defendant Tampa Bay Hotels was involved in the staffing and operation of the Comfort Suites hotel located at 4506 Oak Fair Boulevard, Tampa, Florida 33610 where the Plaintiff was trafficked for sex. Through its relationship with Defendant Choice and the perpetrators who trafficked A.D. at the Comfort Suites Fairgrounds Casino, Defendant Tampa Bay Hotels knowingly benefited or received something of

value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant Tampa Bay Hotels may be served with service of process by serving its registered agent, Raj Patel at 10610 Low Oak Terrace, Thonotosassa, Florida 33592.

29. Defendants Robert Vocisano and Mario Vocisano ("R&M Vocisano"), doing business as the Quality Inn & Suites® Golf Resort ("Quality Inn Golf Resort"), own, operate, manage, and direct one of Defendant Choice's branded properties. Defendants R&M Vocisano were involved in the staffing and operation of the Quality Inn Golf Resort hotel located at 4100 Golden Gate Parkway, Naples, Florida 34116 where the Plaintiff was trafficked for sex. Through their relationship with Defendant Choice and the perpetrators who trafficked A.D. at the Quality Inn Golf Resort, Defendants R&M Vocisano knowingly benefited or received something of value from their facilitation of or participation in a venture which they knew or should have known had engaged in sex trafficking. Defendants R&M Vocisano may be served with service of process at their corporate mailing address, 4100 Golden Gate Parkway, Naples, Florida 34116.

30. Defendant Best Western International, Inc. ("BWI") is one of the largest hotel brands in the world. It owns the Best Western Hotels & Resorts brand, which it licenses to over 4,700 hotels worldwide and is a global network of hotels. It is an Arizona corporation with its headquarters located at 6201 North 24th Parkway, Phoenix, Arizona 85016. It can be served by its registered agent Corporation Service Company, 2338 West Royal Palm Road, Suite J, Phoenix, Arizona 85021.

   a. Defendant BWI owns, supervises, operates, the Best Western® Hotels & Resorts brand and/or has it brand on approximately 4,700 hotels worldwide, including more than 2,000 in North America.

   b. Best Western® is a BWI brand property. BWI owns, supervises, and/or operates

the Best Western® Fort Myers Inn & Suites ("BW Ft. Myers") located at 4400 Ford Street, Fort Myers, Florida 33916.

c. Best Western® is a BWI brand property. BWI owns, supervises, and/or operates the Best Western® Naples Plaza Hotel ("BW Naples") located at 6400 Dudley Drive, Naples, Florida 34105.

d. Best Western® is a BWI brand property. BWI owned, supervised, and/or operated the Best Western® Bonita Springs Hotel ("BW Bonita Springs") that was located at 27991 Oakland Drive, Bonita Springs, Florida 34135.

e. Defendant BWI conducts and operates business throughout the state of Florida.

f. BWI is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Best Western hotels; has caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at its hotels.

g. BWI is the principal in an agency relationship with the Best Western hotels. In addition to BWI's liability under TVPRA section 1595, BWI is vicariously liable for the acts and/or omissions of the staff at its Best Western hotels and all of its franchisee hotels.

h. The Best Western hotels where Plaintiff was trafficked have apparent agency for BWI so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

i. BWI has ratified the actions and inactions of the Best Western hotels.

j.  BWI exercises day-to-day control over the Best Western hotels through its brand standards and retains control over the Best Western hotels under the terms of its franchise agreement.

k.  Defendant BWI and the Best Western® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Best Western® hotel where the Plaintiff was trafficked for sex. Defendant BWI and the Best Western® each share the common policies and practices complained of herein.

l.  Defendant BWI and the Best Western® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

m.  As an integrated enterprise and or joint employer, Defendant BWI and the Best Western® are separately and jointly responsible for compliance with all applicable laws.

n.  As an integrated enterprise and or joint employer, Defendant BWI and the Best Western® are jointly and severally liable for any damages caused by employees.

o.  Defendant BWI and the Best Western® are considered employers under federal labor regulations.

p.  As hotel operator, Defendant BWI controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Best Western® hotels where A.D. was trafficked.

q.  Defendant BWI maintains that it considers guest safety and security to be

important and requires the hotels in its portfolio to comply with BWI brand standards and all local, state, and federal laws.

r. Defendant BWI maintains data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

s. Upon information and belief, Defendant BWI controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by BWI, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Best Western ® hotels where Plaintiff was trafficked

t. Through BWI's relationship with the staff at the Best Western hotels where A.D. was trafficked and where traffickers of Plaintiff were guests or visitors, BWI knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which BWI is entitled to under the franchise agreements.

u. BWI benefits financially from room rentals and other incidentals recognized by

renting rooms in which the Plaintiff was sex trafficked.

    v.   BWI has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

31. Defendant Apex Hospitality, LLLP ("Apex"), doing business as the Best Western® Fort Myers Inn & Suites ("BW Ft. Myers"), is a Florida limited liability limited partnership and is one of Defendant BWI's branded properties. Defendant Apex was involved in the staffing and operation of the Best Western hotel located at 4400 Ford Street, Fort Myers, Florida 33916 where the Plaintiff was trafficked for sex. Through its relationship with Defendant BWI and the perpetrators who trafficked A.D. at the BW Ft. Myers, Defendant Apex knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant Apex may be served with service of process by serving its registered agent, Sanmukh Swami at 17761 San Carlos Boulevard, Fort Myers Beach, Florida 33931.

32. Defendants Robert Vocisano and Mario Vocisano ("R&M Vocisano"), doing business as the Best Western® Naples Plaza Hotel ("BW Naples"), own, operate, manage, and direct one of Defendant BWI's branded properties. Defendants R&M Vocisano were involved in the staffing and operation of the Best Western hotel located at 6400 Dudley Drive, Naples, Florida 34105 where the Plaintiff was trafficked for sex. Through their relationship with Defendant BWI and the perpetrators who trafficked A.D. at the BW Naples, Defendants R&M Vocisano knowingly benefited or received something of value from their facilitation of or participation in a venture which they knew or should have known had engaged in sex trafficking. Defendants R&M Vocisano may be served with service of process at their corporate mailing address, 4100 Golden

Gate Parkway, Naples, Florida 34116.

33.      Defendant Bonita Springs Hotel 1, LLC f/k/a Bonita Springs Hotel, LLC ("Bonita Springs Hotel"), doing business as the formerly known as Best Western® Bonita Springs ("BW Bonita Springs"), is a Virginia limited liability company and is one of Defendant BWI's branded properties. Defendant Bonita Springs Hotel was involved in the staffing and operation of the BW Bonita Springs hotel located at 27991 Oakland Drive, Bonita Springs, Florida 34135 where the Plaintiff was trafficked for sex. Through its relationship with Defendant BWI and the perpetrators who trafficked A.D. at the BW Bonita Springs, Defendant Bonita Springs Hotel knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant Bonita Springs Hotel may be served with service of process by serving its registered agent, Jerry L. Bowman, Esquire, 130 W. Plume Street Norfolk, VA 23510.

34.      Defendant Marriott International, Inc. ("Marriott") is one of the largest hotel franchising companies in the world with over 7,000 branded properties across 131 countries.[6] Marriott offers public lodging services directly and through its affiliates, subsidiaries, and franchises. In 2019, Marriott claimed to have "successfully trained 500,000 hotel workers to spot the signs of human trafficking in its hotels and how to respond if they do."[7] Defendant Marriott is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Dept. 324.13, Bethesda, Maryland 20817. It can be served by its registered agent at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

---

[6] We Are Marriott International, *A Brand Leader*, https://www.marriott.com/marriott/aboutmarriott.mi (last visited Jul. 23, 2021).

[7] News Center, *Marriott International Has Trained 500,000 Hotel Workers to Recognize the Signs of Human Trafficking Wyndham Hotels & Resorts Reinforces Efforts to Combat Human Trafficking*, (Jan. 22, 2020) https://corporate.wyndhamhotels.com/news-releases/wyndham-hotels-resorts-reinforces-efforts-to-combat-human-trafficking/.

a. Marriott is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

b. As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott.

c. Marriott owns, supervises, manages, controls, and/or operates the Fairfield Inn® & Suites Naples ("Fairfield") located at 3804 White Lake Boulevard, Naples, Florida 34117 where A.D. was trafficked.

d. Marriott owns, supervises, manages, controls, and/or operates the SpringHill Suites® by Marriott Naples ("SpringHill") located at 3798 White Lake Boulevard, Naples, Florida 34117 where A.D. was trafficked.

e. Defendant Marriott conducts and operates business throughout the state of Florida.

f. Marriott is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Fairfield and SpringHill hotels; has caused indivisible injuries to A.D. in Florida; and profited from illegal commercial sex trafficking involving Plaintiff at its hotels.

g. Marriott is the principal in an agency relationship with the Fairfield and SpringHill hotels. In addition to Marriott's liability under TVPRA section 1595, Marriott is vicariously liable for the acts and/or omissions of the staff at its Fairfield and SpringHill hotels and all of its franchisee hotels.

h. The Fairfield and SpringHill hotels where A.D. was trafficked has apparent

agency for Marriott so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

i. Marriott has ratified the actions and inactions of the Fairfield and SpringHill hotels.

j. Marriott exercises day-to-day control over the Fairfield and SpringHill hotels through its brand standards and retains control over the Fairfield and SpringHill hotels under the terms of its franchise agreement.

k. Defendant Marriott, Fairfield, and SpringHill are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Fairfield and SpringHill hotels where the Plaintiff was trafficked for sex. Defendant Marriott, Fairfield, and SpringHill each share the common policies and practices complained of herein.

l. Defendant Marriott, Fairfield, and SpringHill jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

m. As integrated enterprise and/or joint employers, Defendant Marriott, Fairfield, and SpringHill are separately and jointly responsible for compliance with all applicable laws.

n. As integrated enterprise and/or joint employers, Defendant Marriott, Fairfield, and SpringHill are jointly and severally liable for any damages caused by their employees.

o. As the principal and as a hotel operator, Marriott controls the training, policies, and decisions on implementation and execution of policy for its branded

properties, including the Fairfield and SpringHill hotels where A.D. was trafficked.

p. Marriott represents that it considers guest safety and security important and requires the brand hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[8]

q. Upon information and belief, Marriott also controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Marriott, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Fairfield and SpringHill hotels where A.D. was trafficked.

r. Through Marriott's relationship with the staff at the Fairfield and SpringHill hotels where Plaintiff was trafficked and where traffickers of Plaintiff were guests or visitors, Marriott knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and

---

[8] *See Marriott Int'l Inc. Human Rights Policy Statement* (July 2017), https://www.marriott.com/marriottassets/Multimedia/PDF/Corporate/HumanRightsStatement.pdf

percentages of the gross room revenue which Marriott is entitled to under the franchise agreements.

s. Marriott benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was sex trafficked.

t. Marriott has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

35. Defendant CHMB Florida Hotel Manager, LLC ("CHMB"), doing business as the Fairfield Inn® & Suites Naples ("Fairfield"), is a Florida limited liability company and is one of Defendant Marriott's branded properties. Defendant CHMB was involved in the staffing and operation of the Fairfield Inn located at 3804 White Lake Boulevard, Naples, Florida 34117 where the Plaintiff was trafficked for sex. Through its relationship with Defendant Marriott and the perpetrators who trafficked A.D. at the Fairfield Inn, Defendant CHMB knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant CHMB may be served with service of process by serving its registered agent, NRAI Services, Inc., at 1200 South Pine Island Road, Plantation, Florida 33324.

36. Defendant CHM Naples II Hotel Partners, Inc. ("CHM Naples"), doing business as the SpringHill Suites® by Marriott Naples ("SpringHill"), is a Delaware corporation and is one of Defendant Marriott's branded properties. Defendant CHM Naples was involved in the staffing and operation of the SpringHill Suites located at 3798 White Lake Boulevard, Naples, Florida 34117 where the Plaintiff was trafficked for sex. Through its relationship with Defendant Marriott and

the perpetrators who trafficked A.D. at the SpringHill Suites, Defendant CHM Naples knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant CHM Naples may be served with service of process by serving its registered agent, National Registered Agents, Inc., at 1209 Orange Street, Wilmington, Delaware 19801.

37. Defendant Holistic Health Healing, Inc. ("HHHI"), doing business as the Conty's Motel ("Conty's"), is a Florida Corporation that can be served through Registered Agent, Robert Conti, at 11238 Tamiami Trail, E, Naples, Florida 34113. Defendant HHHI was involved in the staffing and operation of Conty's located at 11238 Tamiami Trail E, Naples, Florida 34113 where the Plaintiff was trafficked for sex. Through its relationship with the perpetrators who trafficked A.D., Defendant HHHI knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

38. Defendants Wyndham Hotels & Resorts, Inc. ("Wyndham"); La Quinta Holdings, Inc. ("LQH"), La Quinta Management, LLC ("LQM"), and La Quinta Franchising, LLC ("LQF") (collectively, the "La Quinta Defendants"); Choice Hotels International, Inc. ("Choice" or "Choice Hotels"); Best Western International, Inc. ("BWI"); and Marriott International, Inc. ("Marriott") may be collectively referred to as the "Brand Hotel Defendants" or "Brand Hotels."

39. Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

40. This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000).

41. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

**SEX TRAFFICKING UNDER FEDERAL LAW**

42. The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

43. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

44. To best understand the mechanism by which sex trafficking is prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor,

codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

45.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, it is nevertheless a long- recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

### A.     THE HOSPITALITY INDUSTRY'S PARTICIPATION
### IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project[9]*

46.     Human trafficking is the world's fastest growing crime.[10] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[11]

47.     Sex traffickers, or "pimps," use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

48.     The hospitality industry plays a crucial role in the sex trade.[12] The trope of the "no-tell

---

[9]*Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[10] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[11] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index htm.

[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017),

motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

49. The hotel industry derives revenue from hotel room doors ("keys") through relationships with production placement. This has incentivized hotels to open doors indiscriminately without regard to the high incidences of trafficking, which have been known and documented by law enforcement and non-government organizations.

50. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[13] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

51. Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an "in call."

52. Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e., those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and The Plaza Hotel.[14]

53. The problem is industry wide. In the United States, as much as 63% of all trafficking

http://scholarship.sha.cornell.edu/honorstheses/3.
[13] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[14] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

incidents happen in hotels ranging from luxury to economy.[15]

54.     Due to the failure of the hospitality industry to address the issue, hotels are *the* venue of choice for sex trafficking.[16] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

55.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has a duty to train and equip staff on how to identify, report, and prevent sexual exploitation where it is most likely to occur. [17]

56.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[18]

57.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized,

---

[15] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[16] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

[17] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

[18] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[19]

58. From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. Proper training and implementation of reasonable security and cybersecurity measures are the bare minimum necessary for hospitality companies to address regular sex trafficking occurring under their flag.

59. There are many signs of sex trafficking, some of which may be obvious, or under a properly trained staff, would require action. These signs include: an excess of condoms in rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; renting two (2) rooms next door to each other; declining room service for several consecutive days; significant foot traffic in and out of room(s); men traveling with multiple women who appear unrelated; women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety; guests checking in with little or no luggage; hotel guests who prevent another individual from speaking for themselves; or a guest controlling another's identification documents.[20]

60. Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[21] Thus, hospitality companies have acknowledged their obligation to adopt policies and procedures

---

[19] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at:
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[20] *Id*. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[21] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017),
http://scholarship.sha.cornell.edu/honorstheses/3.

related to sex trafficking, but have failed to enforce these policies and procedures as brand standard through to the property level.

61. Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[22]

62. The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

63. At the General Assembly of the United Nations ("UN") convened in New York, New York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[23]

64. In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[24]

65. The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

---

[22] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[23] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.
[24] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/15063917617 47/NoVacany_Report.pdf.

66.     ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including: not renting by the hour, not permitting cash payments, blocking "Internet access to popular websites for online sex ads," and monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests."[25]

67.     In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[26]

68.     Starting in 2010, www.backpage.com became the leader in the advertisement of "adult services," generating annual revenue of approximately $150,000,000.00 and approximately $3,100,000.00 from sex ads in just one week.[27] Between January 2013 and March 2015, ninety-nine percent (99%) of global income related to or arising from www.backpage.com was derived from the website's "adult section," including advertisements sexually exploiting children, and www.backpage.com has been called the "World's Top Online Brothel."[28]

69.     During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to

---

[25] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, available at
https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/15573426968
92/ECPAT-USA_AntiTraffickingHotelChecklist.pdf.
[26] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010),
available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[27] *See e.g.* http://www.chicagotribune.com/business/ct-backpage-raided-ceo-carl-ferrer-arrested-20161006-
story.html; https://www.nytimes.com/2016/10/07/us/carl-ferrer-backpage-ceo-is-arrested.html?_r=0; and
https://www.washingtonpost.com/news/morning-mix/wp/2016/10/07/ceo-of-backpage-called-worlds-top-online-
brothel-arrested-on-pimping-charges/?utm_term=.bbcf8b9dcb10.
[28] *Id.*

concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[29]

70.     Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[30] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[31]

71.     A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[32] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[33]

72.     The United States Senate Permanent Subcommittee on Investigations issued a staff report in January 2017 (hereinafter "Senate Report") entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking" that summarizes the role www.backpage.com has played in the burgeoning criminal industry of sex trafficking, in which www.backpage.com does not deny that the website is used for criminal activity, including the sex trafficking of children.[34]

---

[29] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.
[30] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[31] *Id.* at 15.
[32] Sarkisian, *supra* n.13, at 4.
[33] *Id.* at 5.
[34] *See* http://www.portman.senate.gov/public/index.cfm/files/serve?File_id=5D0C71AE-A090-4F30-A5F5-7CFFC08AFD 48. Additionally, a copy of the full Senate Report plus its appendix can be accessed online at: https://www.hsgac.senate.gov/subcommittees/investigations/reports.

73. According to the January 2017 Senate Report, Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public (excluding reports by Backpage itself).[35]

74. One of the principle findings of the Senate Report is that Backpage knows that it facilitates prostitution and child sex trafficking: "Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick on a pig" by sanitizing them…[and] the company has often refused to act swiftly in response to complaints about particular underage users—preferring in some cases to interpret these complaints as the tactics of a competing escort."[36]

75. In April 2018, Carl Ferrer, the chief executive of Backpage.com, plead Backpage guilty to human trafficking of a teenaged girl, and money laundering by concealing the proceeds from facilitating criminal activity.[37]

76. In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[38]

77. The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[39] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and

---

[35] *Id*.
[36] *See id*.
[37] *See* Jackman, *Backpage CEO Carl Ferrer pleads guilty in three states, agrees to testify against other website officials*, The Washington Post (April 13, 2018) *available at* https://www.washingtonpost.com/news/true-crime/wp/2018/04/13/backpage-ceo-carl-ferrer-pleads-guilty-in-three-states-agrees-to-testify-against-other-website-officials/.
[38] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.
[39] *Id*. at 389.

in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[40]

78.     Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[41]

79.     Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[42] In fact, some scholars estimate that hotels and motels account for over ninety percent (90%) of commercial exploitation of children.[43] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[44]

80.     Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[45] The hotel industry is enabling instead of preventing the sexual exploitation of children.[46]

81.     The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex traffickers move from place to place so that they are less visible to law enforcement. Similarly, sex

---

[40] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[41] Sarkisian, *supra* n.13.
[42] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation. Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[43] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).
[44] U.S. Dep't of State, *supra* n.37, at 387.
[45] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.
[46] *See* http://www.ecpatusa.org/wp-content/uploads/2016/05/Regional-Report-North-America.pdf.

traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Indeed, hotel staff are often the only outside witnesses to the victims' abuse. But traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

82.    Further, campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiatives as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[47] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[48]

83.    Defendants agree that human trafficking is a problem globally, but not one brand admits that human trafficking is a problem in their businesses at their brand locations.

84.    Defendants' "solution" to the problem of human trafficking is always the same—to give lip service about more employee training, and to identify some red flags related to trafficking. But this employee training has never really occurred *en masse*. For instance, according to the reporting in ECPAT's reports, the actual number of employees trained is abysmal. Moreover, although the training may provide some information in identifying trafficking, it provides no clear message on training that will serve to actively address or prevent human trafficking.

85.    Reports by the Polaris Project were received and reviewed by the executives, directors and managers of Defendants.

---

[47] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[48] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

86.     To curry more favor with the public, Defendants together, most often through state and national associations like the American Hotel & Lodging Association ("AHLA")[49]—where the Hotel Brand Defendants are all members[50]—advertise policies, practices, and procedures that indicate a unified commitment to fighting human trafficking.[51]

87.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly failed to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely towards profit and the bottom line.

## A.    THE BRAND HOTEL DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

88.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

89.     The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent

---

[49] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. See American Hotel & Lodging Association, Who We Are, available at https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

[50] *See* American Hotel & Lodging Association, Our Members, *available at* https://www.ahla.com/our-members.

[51] *See, e.g*., NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking." http://www.ahla.com/uploadedFiles/_Common/pdf/Trafficking_Principles_Industry_Update.pdf) (note that AHLA's Industry Principles article has since been removed from its website).

hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

90. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand-wide central reservation system, 800 number, revenue management tools, property management software, IT support, customer support, data on customer reviews, world-class loyalty programs, and a website. Thus, booking, room reservations, and internet data collection are controlled by the corporate parent brand.[52]

91. The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

92. Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

93. At the time of the incidents alleged herein:

   a. Defendant Wyndham owned and controlled the Wyndham® Westshore brand hotel.

   b. The La Quinta Defendants owned and controlled the La Quinta Inn® by Wyndham Tampa Bay Airport and La Quinta Inn® by Wyndham Naples Downtown brand hotels.

   c. Defendant Choice owned and controlled Comfort Inn & Executive Suites®,

---

[52] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

Comfort Suites®, and Quality Inn & Suites® brand hotels.

d. Defendant BWI owned and controlled Best Western® Inn & Suites and Best Western® hotel brands.

e. Defendant Marriott owned and controlled Fairfield Inn & Suites® and SpringHill Inn® brand hotels.

94. Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

95. Defendants magnify their influence and control over the hospitality industry through their membership and activity in trade associations such as AHLA.

96. All Brand Hotel Defendants are members of AHLA, and Defendants such as Wyndham have served on executive committees or as board members in AHLA,[53] or other state and national associations since at least 2008.[54]

97. The AHLA serves as a forum for Defendants to discuss efforts related to human trafficking and as a voice from which the Defendants can address the issue with the public.

98. Through national hotel industry trade associations, Defendants disseminated very specific talking points to provide to the government, law enforcement, the public, and the media. These talking points amounted to nothing but spin whereby Defendants tote themselves as heroes. These were more than advertising campaigns. They were part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away from the brands and assure them that the hotel industry, and Defendants specifically, were meaningfully addressing the industry-wide problem of human trafficking. By representing to the public and to legislators "the industry's

---

[53] *See* https://www.ahla.com/press-release/ahla-announces-2020-officers-board-executive-committee-amid-record-membership.
[54] *See* American Hotel & Lodging Association, Partner State Associations, *available at* https://www.ahla.com/psa.

ongoing commitment and work to end human trafficking"[55] the Defendants assumed the responsibility of meaningfully addressing human trafficking at their branded properties.

99. Upon information and belief, between at least 2008 to 2016 Defendant Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

100. Upon information and belief, between at least 2008 to 2016 the La Quinta Defendants held meetings among its executives, directors, and managers at which sex trafficking in their hotels was discussed.

101. Upon information and belief, between at least 2008 to 2016 Defendant Choice Hotels held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

102. Upon information and belief, between at least 2008 to 2016, Defendant BWI held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed

103. Upon information and belief, between at least 2008 to 2016, Defendant Marriott held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

104. Upon information and belief, between at least 2008 to 2016 the Brand Hotel Defendants held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

105. Upon information and belief, during at least 2008 to 2016, emails were exchanged by employees of Defendants' respective brands that related to sex trafficking in hotels, including

---

[55] *See* https://www.ahla.com/issues/human-trafficking.

Defendants' hotels.

106. As industry leaders, Defendants each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

107. Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access. In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

108. Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all trafficking ventures occur at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from human trafficking ventures.

109. Defendants' coordinated efforts created an industry standard of giving lip service to tackling human trafficking while in practice implementing nothing meaningful or effective.

Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties. While it would be challenging and expensive (both business expenses and lost revenues from traffickers) to implement effective policies, it is apparent that an effective policy would create a long term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

## B. THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

110. Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

111. Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[56]

112. **WYNDHAM HOTELS AND RESORTS, INC. ("WYHDHAM"):**

    a. Defendant Wyndham owns, supervises, or operates the Wyndham Tampa Westshore hotel located at 700 N. Westshore Blvd., Tampa, Florida 33609; the

---

[56] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

La Quinta Inn® located at 4730 West Spruce Street, Tampa, Florida 33607; and the La Quinta Inn® located at 1555 5th Avenue, Naples, Florida 34102. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b. For years Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Wyndham Tampa Westshore and La Quinta branded properties, yet Defendant Wyndham has failed to take action to prevent sex trafficking at Wyndham and La Quinta brand properties and still persists in failing to take necessary action to prevent sex trafficking on its properties. Defendant Wyndham's inattention in this regard enabled and contributed to the sex trafficking the Plaintiff suffered at the Wyndham Tampa Westshore and La Quinta hotels.

c. There are numerous examples across place and time of Defendant Wyndham's knowledge of sex trafficking on its branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

d. Upon information and belief, Plaintiff alleges that Wyndham implemented means which gave it the ability to monitor various guest reviews indicating prostitution, trafficking, and guest safety issues at its branded hotels.

e. In 2011, Defendant Wyndham's predecessor entity Wyndham Worldwide Corporation, signed the Code, but as evidenced by the widespread sex trafficking which continued to occur at Defendant Wyndham's branded properties, Defendant Wyndham did not practice what it preached. Wyndham trained only

*some* of its employees to look for signs of trafficking.[57] Defendant Wyndham's adoption of the Code was nothing more than a strategic maneuver through which it sought a shield against liability, rather than a sword against human trafficking.

f. Despite Defendant Wyndham's anti-trafficking stance, Defendant Wyndham failed to implement and enforce any of its own policy or policies, including with respect to the Wyndham Tampa Westshore and the La Quinta® hotels. Defendant Wyndham knew or should have known that the Wyndham Tampa Westshore and the La Quinta® hotels were located in an area known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when A.D. was trafficked. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Defendant Wyndham failed to take adequate measures to prevent the misconduct.

g. Defendant Wyndham voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnerships with ECPAT and Polaris, and its activities with the AHLA and other trade organizations. However, Wyndham failed to implement its own policies and those recommended to it by the above mentioned advocacy organizations which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of A.D.[58]

h. Defendant Wyndham knew of sex trafficking occurring on its branded hotel

---

[57] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[58] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

properties. Wyndham and La Quinta® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham and La Quinta® knew that all of this violent and criminal activity was occurring at their branded properties and therefore knew that sex trafficking was occurring at their branded properties. Yet Wyndham and La Quinta® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta®. Specifically, Wyndham and La Quinta® facilitated the trafficking through their practices, policies, and procedures. Wyndham and La Quinta® failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham and La Quinta® could continue to profit from the business that trafficking brings, including business from out-of-state.

i. Defendant Wyndham should have known of sex trafficking occurring on its branded hotel properties. Wyndham and La Quinta® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham and La Quinta® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew or should have known that sex trafficking was occurring at their branded properties. Yet, Wyndham and La Quinta® allowed, authorized, permitted,

induced, or encouraged the trafficking of individuals for sex at the La Quinta®. Specifically, Wyndham and La Quinta® facilitated the trafficking through their practices, policies, and procedures. Wyndham and La Quinta® failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham and La Quinta® could continue to profit from the business that trafficking brings, including business from out-of-state.

j. Wyndham knew or should have known that the Wyndham Tampa Westshore and the La Quinta® hotels where Plaintiff A.D. was trafficked were located in areas known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

k. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

l. Wyndham was in an agency relationship with the Wyndham Tampa Westshore and the La Quinta® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over the Wyndham Tampa Westshore and the La Quinta® hotels by Defendant Wyndham's operations, including the means and methods of how Wyndham and La Quinta® branded hotels conducted daily business through one or more of the following actions:

i. providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brands;

ii. providing reservation platforms where payment modes and suspicious

reservations would suggest trafficking;

iii. providing new hire orientation on human rights and corporate responsibility;

iv. providing training and education to Wyndham® and La Quinta® branded hotels through webinars, seminars, conferences, and online portals;

v. providing and controlling customer review and response platforms;

vi. hosting online bookings on Wyndham's domain;

vii. requiring Wyndham® and La Quinta® branded hotels to use Defendant Wyndham's customer rewards program;

viii. requiring Wyndham® and La Quinta® branded hotels to use Defendant Wyndham's property management software;

ix. requiring Wyndham® and La Quinta® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x. providing IT support for all property management systems, owned, operated and required by Wyndham;

xi. setting employee wages;

xii. making employment decisions;

xiii. advertising for employment;

xiv. sharing profits;

xv. standardized training methods for employees;

xvi. building and maintaining the facility in a manner specified by the

owner;

xvii. standardized or strict rules of operation;

xviii. regular inspection of the facility and operation by owner;

xix. fixing prices; or

xx. other actions that deprive Wyndham® and La Quinta® branded hotels of independence in business operations.

m. Upon information and belief, Defendant Wyndham tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Wyndham's management and control and included all of the indicia of A.D.'s trafficking. This data included the details of A.D.'s check-in, the internet activity associated with her reservation, including Backpage.com advertisements listing the hotel's address, her location at the hotel, which included the notable fact that she rarely, if ever, left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

n. An apparent agency also exists between Defendant Wyndham and Wyndham® and La Quinta® branded hotels. Defendant Wyndham held out Wyndham® and La Quinta® branded hotels to the public as possessing authority to act on its behalf.

o. Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Wyndham® and La Quinta® branded hotels, Defendant

Wyndham breached its duties in the following ways:

i. did not adequately distribute information to assist employees in identifying human trafficking;

ii. failed to mandate a process for escalating human trafficking concerns within the organization;

iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

iv. failed to provide new hire orientation on human rights and corporate responsibility;

v. failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi. failed to develop and hold or require ongoing training sessions on human trafficking;

vii. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii. failed to evaluate universal reservation systems for suspicious booking activities;

ix. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x. failed to ban cash or prepaid credit cards as payment; and

xi. failed to filter, monitor, and block classified advertising websites

known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

p. Upon information and belief, Defendant Wyndham requires its branded hotel properties to use a property management system, which is linked to Defendant Wyndham's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

q. Defendant Wyndham uses a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[59]

r. Defendant Wyndham requires its hotels to carry a certain level of Wi-Fi internet access or security for hotel guests, through a limited number of vendors that Defendant Wyndham specifies and requires.[60]

s. In 2016, Defendant Wyndham approved two internet vendors.[61] In 2020, Defendant Wyndham approved six: Deep Blue Communications, Safety NetAccess, Air2Data High Speed Wireless, ITG Networks, Allbridge, and Wyndham HCS.[62]

---

[59] *See* Wyndham Privacy Notice, *available at* https://www.wyndhamhotels.com/about-us/privacy-notice-more-info?lightbox=/content/whg-ecomm-responsive/en-us/whg/about-us/privacy-notice-more-info.display html, last accessed August 26, 2020.

[60] *See* 2020 Technology Guide, Q1 2020, published by Wyndham Strategic Sourcing. Brand Standards described in this document and set by Wyndham in 2016 state that "Wi-Fi must be installed and offered complimentary in all guestrooms/suites, lobby, business center, meeting room space and public areas."

[61] *See* Q3 2016 eNews Sourcing News & Best Practices by Wyndham Hotel Group.

[62] *See* https://web.archive.org/web/20200427225133/http://transfer nxtbook.com/nxtbooks/mcneill/vendor_2011winter/offline/mcneill_vendor_2011winter.pdf.

t.  Upon information and belief, Defendant Wyndham requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Wyndham the ability to access and harvest that internet data.[63]

u.  Upon information and belief, Defendant Wyndham retains and/or can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

v.  This access may have included branded hotels' guest information registration, including names, date of booking, and length of stay.

w.  Upon information and belief, Defendant Wyndham can therefore see unusual or suspicious bookings, for instances, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when in the case of A.D., reservations for extended stays were requested.

x.  Upon information and belief, Defendant Wyndham has the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites.[64]

y.  Upon information and belief, Defendant Wyndham can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

---

[63] *See* Top 10 Hotel Wi-Fi Features, published by Deep Blue Communications in November 2014. One of Wyndham's longest running certified wireless internet vendors, Deep Blue Communications, includes in its marketing materials that (emphasis added) "**customized landing pages** protect both the guests and hotel from the hassle of disputed charges, and **protect the hotel from guests who may use the Internet for illegal purposes**."
[64] *See*, *e.g.*, https://money.cnn.com/2016/07/15/news/companies/starbucks-mcdonalds-wifi-porn/index html; https://endsexualexploitation.org/articles/filterpublicwifi_starbucks_library_congress/.

z. Upon information and belief, and contrary to ECPAT best practices, Defendant Wyndham failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

aa. Upon information and belief, Defendant Wyndham has the ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the La Quinta® where Plaintiff was trafficked for sex.

bb. Despite access to information comprising clear sex trafficking indicators, Defendant Wyndham continued to permit and profit from hotel guests who rented hotel rooms to buy sex, including those who bought Plaintiff.

cc. Upon information and belief, Defendant Wyndham monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

dd. Upon information and belief, Defendant Wyndham provides a platform for brand property employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Wyndham controls and houses this collective data from all branded properties.

ee. Thus, for several years, Defendant Wyndham has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Wyndham® and La Quinta® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at the Wyndham® and La Quinta® hotels that form the basis of this complaint.

    i. In August 2008, a woman was arrested for running an escort service

out of various hotels in Bergen, Passaic, Hudson, and Essex counties, which included the La Quinta Hotel on Route 46.

ii. In July 2009, a Cambridge pimp whose mom was a well-known political staple in the city was arrested after police found a woman set up in a prostitution scheme in the La Quinta Inn in Somerville.

iii. In November 2013, the La Quinta Inn in San Diego, California was sued by the City Attorney's Office for its history of illegal activity. Police had made several prostitution arrests in a short span of time and often found several prostitutes on site at the hotel. In reaching a settlement with the property and franchise owners, the hotel agreed to toughen its policies, add cameras, and check identification of guests and visitors.

iv. In February of 2015, one reviewer stated: "…As a woman traveling by herself, I definitely do not feel safe with the patrons I have encountered here…" RJRHLK[65]

v. In August of 2015, one reviewer stated: "Do NOT, under no circumstace (sic) stay here with your family!  I am closing on a house soon, and decided to leave my family here while I work a few hours away. First the neighborhood is really bad and dangerous. Last week the police came to the hotel with guns out looking for an individual and today, August 24, 2015.  When my wife arrived to the hotel after picking up my daughter from school, the police were there again,

[65] Hotel Review from Tripadvisor.com https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or65-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida html#REVIEWS

apparently something to do with drugs…"[66]

vi.    In May of 2015, one reviewer stated: "We spent two nights at this hotel and during the second night there were people screaming and arguing in the corridor. Then they start to shoot the doors and we ask for help from the front desk nobody came.  We ran away the hotel at the first hour in the morning.  The worst experience we ever had in USA."[67]

vii.    In November of 2015, one reviewer stated: "This was the worst hotel I have ever stayed in. The first room they gave me was incredibly dirty and smelled like mold and vomit. I was switched to a different room and that was just as dirty. The lobby is the only thing that is updated. The second room I was given was filthy. I later found out that the hotel is used to house indigent people. There were men walking around who were clearly on drugs and who lived there. When speaking with friends in Naples, I learned that this hotel is used to home homeless men. I would never recommend such a place to anyone. I felt intimidated by these indigent men who would watch me in the parking lot. There was garbage everywhere and it wasn't cleaned up the entire weekend I was there. I am truly shocked that a national chain hotel would allow this to happen on their premises. I could go on and on about how disappointed I was with this hotel. Bottom line, I will never

---

[66] Hotel Review from Tripadvisor.com https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or65-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida html#REVIEWS
[67] Hotel Review from Tripadvisor.com https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or65-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida html#REVIEWS

stay here again and would advise friends and family to avoid it too."[68]

viii. In January of 2019, one reviewer stated: "The LaQuinta itself was a nice, clean, updated property. The only issue we had was the bed was too hard. Needs some foam toppers to make them more comfortable. Otherwise everything was great in the room itself. The issue that was a great cause for concern were the "ladies of the evening" that a construction crew had hired who were also staying at the hotel. There were two ladies that we noticed running through the lobby for smoke breaks etc...Later one lady was outside smoking and crying, she then went back inside to the main lobby restroom to sob loudly where everyone could hear. While the construction crew stood outside in the parking lot smoking and laughing. When she finally came out, she ran to her car sobbing while the construction crew laughed and cat called. Her fellow female partner she had come with followed behind her with her head down. We were outside walking our dog and I asked the second lady what had happened. She told me the guys had refused to pay and had become abusive. I went to find assistance in the lobby from staff to get the situation under control but no one was out front behind the counter and had not been for most of the evening. When someone finally came from the back (a guy), he assured me no such activiy (sic) was occurring in his hotel. Sigh..."[69]

[68] Hotel Review from Tripadvisor.com, available at https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or55-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida.html#REVIEWS
[69] Hotel Review from Tripadvisor.com https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or30-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida html#REVIEWS

ix. In May of 2019, one reviewer stated: "My room was disgusting when i went to the front dest (sic) there was a lady trying to make some money, i walked away to be met in the elevator by a gentleman who said he was alitle (sic) high and would like to rest in my room, i couldnt get out fast enough, he followed me to my room i turned and told him my husband was there and he needed to go away. I placed a chair against the door all night. I took my dog out in the morning and there was some guys smoking joints outside the door way. My room was horrible. My night worse. But i all fairness the front dest (sic) staff were lovely. The other staff did not understand english."[70]

x. In December of 2019, one reviewer stated: "Twice. 2:45 am two men showed up at my door, looking for someone's room. Seems strangers walk the halls at night. Moved to another room at 3am…" Carol P.[71]

xi. In October of 2019, one reviewer stated: "However, this visit I discovered that the back door into the hotel was not locked 24 hours as the sign stated. My son and I observed different people coming through the back door near the pool and they were not staying there and quickly went out the front door. I advised the girl at the front desk about the door and she said it was a maintenance problem and the door needed to be secured. The police were called to the hotel after my

---

[70] Hotel Review from Tripadvisor.com https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or25-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida html#REVIEWS
[71] Hotel Review from Tripadvisor.com https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or20-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida html#REVIEWS

complaint but nothing was done."[72]

ff. Upon information and belief, Defendant Wyndham monitors customer reviews and complaints for all brand properties.

gg. Upon information and belief, the branded properties depend on Defendant Wyndham for notification of negative customer reviews.

hh. Upon information and belief, Defendant Wyndham, not the branded properties, house and control the data regarding customer reviews.

113. **LA QUINTA HOLDINGS, INC. ("LQH") and CAVALIER MERGERSUB LP F/K/A COREPOINT LODGING, INC. ("CPLG"):**

a. Defendants CPLG and LQH own, supervise, or operate the La Quinta Inn® located at 4730 West Spruce Street, Tampa, Florida 33607 and the La Quinta Inn® located at 1555 5th Avenue, Naples, Florida 34102. LQH failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b. Defendants CPLG and LQH had actual knowledge of sex trafficking occurring on its branded hotel properties because CPLG and LQH and La Quinta Inn® knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. CPLG, LQH and La Quinta Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta Inn®, CPLG, LQH and La Quinta Inn® facilitated the

---

[72] Hotel Review from Tripadvisor.com https://www.tripadvisor.com/Hotel_Review-g34467-d87447-Reviews-or20-La_Quinta_Inn_Suites_by_Wyndham_Naples_Downtown-Naples_Florida html#REVIEWS

trafficking through its practices, policies, and procedures. CPLG, LQH and La Quinta Inn® failed to take appropriate action to prevent the trafficking of individuals for sex so that CPLG, LQH and La Quinta Inn® continue to profit from the business that trafficking brings, including business from out-of-state.

c. Defendants CPLG and LQH had constructive knowledge of sex trafficking occurring on its branded hotel properties because CPLG, LQH and La Quinta Inn® knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. CPLG, LQH and La Quinta Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta. CPLG, LQH and La Quinta Inn® facilitated the trafficking through its practices, policies, and procedures. CPLG, LQH and La Quinta Inn® failed to take appropriate action to prevent the trafficking of individuals for sex so that CPLG, LQH and La Quinta Inn® continue to profit from the business that trafficking brings, including business from out-of-state.

d. Defendants CPLG and LQH knew or should have known that the La Quinta Inn® hotel where Plaintiff A.D. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

e. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendants CPLG and LQH has repeatedly failed to stop

these actions.

f.  Defendants CPLG and LQH was in an agency relationship with La Quinta Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendants CPLG and LQH's exercise of an ongoing and systemic right of control over La Quinta Inn® hotels by Defendants CPLG and LQH's operations, including the means and methods of how La Quinta Inn® branded hotels conducted daily business through one or more of the following actions:

    i.  providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brands;

    ii.  providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    iii.  providing new hire orientation on human rights and corporate responsibility;

    iv.  providing training and education to La Quinta® branded hotels through webinars, seminars, conferences, and online portals;

    v.  providing and controlling customer review and response platforms;

    vi.  hosting online bookings on Defendants CPLG and LQH's domain;

    vii.  requiring La Quinta® branded hotels to use Defendants CPLG and LQH's customer rewards program;

    viii.  requiring La Quinta® branded hotels to use Defendants CPLG and LQH's property management software;

    ix.  requiring La Quinta® branded hotels to use approved vendors for

internet services or other requirements for Wi-Fi access and filtering;

x. providing IT support for all property management systems, owned, operated and required by CPLG and LQH;

xi. setting employee wages;

xii. making employment decisions;

xiii. advertising for employment;

xiv. sharing profits;

xv. the ability of Defendants CPLG and LQH to cancel any agreement with the La Quinta Inn if rules are violated;

xvi. regular inspection of the La Quinta Inn hotels and operations or management by Defendants CPLG and LQH;

xvii. standardized training methods for employees;

xviii. building and maintaining the facility in a manner specified by the owner;

xix. standardized or strict rules of operation;

xx. regular inspection of the facility and operation by owner;

xxi. fixing prices; or

xxii. other actions that deprive La Quinta® branded hotels of independence in business operations.

g. An apparent agency also exists between Defendants CPLG and LQH and the La Quinta Inn® hotels. Defendants CPLG and LQH held out La Quinta Inn® branded hotels to the public as possessing authority to act on its behalf.

h. Given Defendants CPLG and LQH's public statements on behalf of its hotel

brands and the control it assumed in educating, implementing, and directing its branded hotels, including La Quinta Inn® branded hotels, Defendants CPLG and LQH breached its duties in the following ways:

    i.     did not adequately distribute information to assist employees in identifying human trafficking;

    ii.     failed to provide a process for escalating human trafficking concerns within the organization;

    iii.     failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv.     failed to provide new hire orientation on human rights and corporate responsibility;

    v.     failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi.     failed to develop and hold or require ongoing training sessions on human trafficking; or

    vii.     failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

i. For years, Defendants CPLG and LQH has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its La Quinta Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at La Quinta Inn®

hotels that forms the basis of this complaint.

    i.    In August 2008, a woman was arrested for running an escort service out of various hotels in Bergen, Passaic, Hudson, and Essex counties, which included the La Quinta Hotel on Route 46. [73]

    ii.    In July 2009, a Cambridge pimp whose mom was a well-known political staple in the city was arrested after police found a woman set up in a prostitution scheme in the La Quinta Inn in Somerville. [74]

    iii.    In November 2013, the La Quinta Inn in San Diego, California was sued by the City Attorney's Office for its history of illegal activity. Police had made several prostitution arrests in a short span of time and often found several prostitutes on site at the hotel. In reaching a settlement with the property and franchise owners, the hotel agreed to toughen its policies, add cameras, and check identification of guests and visitors. [75]

    iv.    In February 2016, a La Quinta Inn owner was arrested during a prostitution bust. One woman was arrested for prostitution and the owner was arrested for tipping the woman off when police arrived. Police also said the owner knew that the woman was using the room at the La Quinta to solicit prostitution. [76]

---

[73] *Paterson woman charged with running local prostitution service*, THE PROGRESS (Aug. 15, 2008), available at https://www.newjerseyhills.com/the_progress/news/paterson-woman-charged-with-running-local-prostitution-service/article_bb36894b-ee4c-5bdf-9b5c-e1873080b1f9 html.

[74] *Former state rep's son accused of being a pimp; says he was 'helping' hooker*, METROWEST DAILY NEWS (Jul. 1, 2009), https://www.metrowestdailynews.com/article/20090701/News/307019964

[75] *City atty.: Hookers worked out of La Quinta Inn*, THE SAN DIEGO UNION-TRIBUNE (Nov. 21, 2013), https://www.sandiegouniontribune.com/sdut-la-quinta-inn-prostitution-rancho-penasquitos-2013nov21-story.html.

[76] *La Quinta Inn Hotel Owner Arrested in Prostitution Bust*, SPECTRUM NEWS (Feb. 27, 2016), https://spectrumlocalnews.com/nys/buffalo/news/2016/02/27/hotel-owner-arrested-in-prostitution-bust.

j. Additionally, Defendants CPLG and LQH has been aware of sex trafficking occurring on La Quinta Inn brand properties through publicly available online review websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on La Quinta Inn® brand properties and Defendant CPLG and LQH's inattentiveness, for example:

   i. Regarding a January 2009 stay at a La Quinta Inn in Elmsford, New York, a customer wrote: "Also to make my trip exciting was the hooker that keeps going to the back door to meet her [trick]. Blondie has quit a business going on I smoke so I would go outside to have a [cigarette] and a few times I was approached by her trick and would have to tell him she was at the door waiting. It was very uncomfortable. Even my pregnant daughter was approached. By our third night a new hooker had come to stay."[77]

   ii. In December of 2009, a reviewer described the La Quinta in Fort Lauderdale, Florida as follows: "But I personally don't like to be approached by prostitutes or watch them hang around the front desk and socialize with the staff."[78]

   iii. Regarding a November 2013 stay at a La Quinta Inn in Milwaukee, Wisconsin, a customer wrote: "…The first thing I noticed when we pulled up was the obvious hooker outside… This hotel is SUPER gross. It's just a hang out for prostitutes and drug users. The staff is

---

[77] Review of La Quinta Inn & Suites by Wyndham White Plains – Elmsford, Elmsford, New York (Jan. 7, 2009), available at https://time.com/3525640/sex-trafficking-victim-prostitution-hotel/.
[78] Review of La Quinta Inn by Wyndham Ft. Lauderdale Tamarac East (Dec. 4, 2009), available at https://www.tripadvisor.com/ShowUserReviews-g34227-d224784-r50604892-La_Quinta_Inn_by_Wyndham_Ft_Lauderdale_Tamarac_East-Fort_Lauderdale_Broward_County_.html

obviously either partaking, or allowing it to happen. Either way, this hotel management needs to think about hiring new people who won't turn their hotel into a sleazy, disgusting mess…" [79]

    iv.    In March of 2015, a reviewer described the La Quinta in Jacksonville, Florida as follows: "2nd time staying here and both times they had hookers in the lobby and sitting in cars in the parking lot. While unloading the car I saw a drug deal going on and when we left the guy was sitting at the side of the building. What really got me was the hookers hanging out at the front desk."[80]

    v.    Regarding a March 2016 stay at a La Quinta Inn in Sacramento, California, a customer wrote: "Unfortunately, this motel is used by many people who use drugs and many of the purchases occurred in the back parking lot. There were also prostitutes and their guests. If you're not into this I recommend you choose another motel." [81]

    k.    Upon information and belief, the branded properties depend on Defendants CPLG and LQH for notification of negative customer reviews.

    l.    Upon information and belief, Defendants CPLG and LQH, not the branded properties, house and control the data regarding customer reviews.

114.    **CHOICE HOTELS INTERNATIONAL, INC. ("CHOICE"):**

---

[79] Review of La Quinta Inn by Wyndham Milwaukee Glendale Hampton Ave (Dec. 3, 2013), *available a*t https://www.tripadvisor.com/ShowUserReviews-g59917-d240573-r186657751-La_Quinta_Inn_by_Wyndham_Milwaukee_Glendale_Hampton_Ave-Glendale_Wisconsin html.
[80] Review of La Quinta Inn & Suites by Wyndham Jacksonville Mandarin (Mar. 7, 2015), available at https://www.tripadvisor.com/ShowUserReviews-g60805-d120186-r258296436-La_Quinta_Inn_Suites_by_Wyndham_Jacksonville_Mandarin-Jacksonville_Florida.html
[81] Review of La Quinta Inn by Wyndham Sacramento North (Mar. 8, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g32999-d79713-r354487204-La_Quinta_Inn_by_Wyndham_Sacramento_North-Sacramento_California html.

a. Defendant Choice owns, supervises, or operates the Comfort Inn® & Executive Suites located at 3860 Tollgate Boulevard, Naples, Florida 34114; the Comfort Suites® at Fairgrounds Casino located at 4506 Oak Fair Boulevard, Tampa, Florida 363610; and the Quality Inn® & Suites Golf Resort – Naples located at 4100 Golden Gate Parkway, Naples, Florida 34116. Defendant Choice failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b. Defendant Choice has known for years that pimps and traffickers use its hotels to carry out their crimes.[82] Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Choice repeatedly failed to make reasonable efforts to stop these crimes.[83]

---

[82] *See* Review of Quality Inn Columbus - East (Mar. 10, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g50891-d226034-r154180408-Quality_Inn_Columbus_East-Reynoldsburg_Ohio html (last visited Mar. 4, 2019) ("I've been solicited for drugs and by prostitutes here on several occasions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms.").

[83] *See, e.g.,* Amanda Covarrubias, *Five Arrested After Months-Long Investigation Into Human Trafficking Ring* (Aug. 23, 2016), https://www.vcstar.com/story/news/crime/2016/08/23/five-arrested-after-monthslong-investigation-into-human-trafficking-ring/89254044/ (Five men arrested in Ventura County, California at a Comfort Inn for forcing at least 28 women into prostitution); The Bakersfield Californian, *Man Arrested On Suspicion Of Human Trafficking* (Feb. 25, 2016), https://www.bakersfield.com/news/breaking/man-arrested-on-suspicion-of-human-trafficking/article_3f5f6ee8-008e-5ef9-ad28-5f4ecb667a1c.html (Suspect arrested in Bakersfield, California at a Quality Inn on suspicion of human trafficking of a minor); The East Carolinian, *GPD Discovers Child Prostitution* (Dec. 2, 2014), http://www.theeastcarolinian.com/news/article_59f8d72a-79c9-11e4-86d3-eb5396cc62f5.html (Arrest made in Greenville, North Carolina for human trafficking of a fourteen-year-old girl at a Quality Inn); ClarkvilleNow.com, *Oak Grove Police Sergeant, Two Others Arrested During Prostitution Investigation* (Sept. 28, 2016), http://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/ (Three arrested in Oak Grove, Kentucky and charged with human trafficking after holding a woman against her will at a Quality Inn and forcing her to have sex with several men); *Christopher Hoffman*, The Hartford Courant, *Wethersfield Police Break Up Motel Prostitution Operation* (Jul. 11, 2014), http://articles.courant.com/2014-07-11/community/hc-wethersfield-prostitution-0711-20140710_1_prostitutes-affidavits-police-break (Comfort Inn management arrested in Wethersfield, Connecticut for promoting prostitution at the hotel); Thomasi McDonald, *Raleigh Police Charge Wilson Man With Forcing Child Into Prostitution* (Feb. 11, 2016), http://www.newsobserver.com/news/local/crime/article59910551.html (Man arrested in Raleigh, North Carolina for human trafficking and prostitution of a fifteen-year-old girl at an Econo Lodge -- also a Choice brand hotel); Megan Brockett, Capital Gazette, *Laurel Hotels Among Those Named In Human Trafficking Indictments* (Aug. 16, 2016), http://www.capitalgazette.com/news/for_the_record/ph-ac-cn-human-trafficking-0817-20160816-story.html (Three arrested in Prince George's County, Maryland in a large-scale human trafficking venture which operated in part out of an Econo Lodge); *Josh Kovner and Suzanne Carlson*, The Hartford Courant, *Federal Task Force Targets Sex Trafficking Of Minors In Connecticut* (Nov. 5, 2015),

c. On November 10, 2009, a young child was raped and killed at a Comfort Inn, which is a Choice brand hotel, in Fayetteville, North Carolina. [84] The incident caused such outrage that child advocates petitioned Defendant Choice to take steps to prevent sex trafficking in its hotels.[85] It was only after this horrific incident that Defendant Choice started to publicize a need for change. In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[86] However, Defendant Choice did not enforce the program, or require its employees to complete this training, or even follow up to make sure the hotels were following the protocols.[87]

d. In 2012, an anti-trafficking coalition alerted Defendants Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.

e. Even though Defendant Choice has sought and received publicity for its anti-human trafficking measures, Defendant Choice could have accessed data and databases, including from data from POLARIS, that demonstrated that the prevalence of human trafficking at Defendant Choice brand hotels and in the

---

http://www.courant.com/news/connecticut/hc-minor-sex-traffic-1104-20151104-story.html (Arrest made in East Hartford, Connecticut for human trafficking of a minor at a local Econo Lodge).

[84] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009), http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)

[85] *See* Change.org Petition, *Tell Choice Hotels To Prevent Child Prostitution In Their Hotels*, available at https://www.change.org/search?q=tell+choice+hotels+to+prevent+child+prostitution+in+their+hotels (last visited Mar. 4, 2019).

[86] *See* Choice Hotels*, Human Rights Policy*, available at https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar. 4, 2019); *see also* ECPAT-USA, *Tourism Protection Code of Conduct*, available at http://www.ecpatusa.org/code/ (last visited Mar. 4, 2019).

[87] *See* Choice Hotels, *Human Rights Policy, supra* n.30.

hospitality industry generally. Despite the availability of such data and information, Defendant Choice ignored or turned a blind eye to the growing body of information regarding the prevalence of human trafficking at Choice brand hotels and in the hospitality industry generally and continued to profit from the human trafficking occurring at Choice brand hotels.

f. In the instance of Plaintiff A.D., had staff been properly trained, many of the human trafficking red flags would have been recognized and reported. But Defendant Choice chose not to invest the time to implement and execute the anti-trafficking program. Instead, the only steps they took were to advertise to the public that they had implemented human trafficking policies. Defendant Choice breached its duties and did not implement or enforce anti human trafficking policies that could have saved the Plaintiff from being sex trafficked at its branded hotels.

g. Despite knowledge of the problem of sex trafficking in its hotels, Defendant Choice did not require that employees participate in training to prevent sex trafficking and only "recommended" this training to new employees during the time the Plaintiff was victimized.[88]

h. At the time of the incidents alleged herein, Defendant Choice was in an agency relationship with Comfort Inn, Comfort Suites, and Quality Inn and offered public lodging services in the hotels.

i. Defendant Choice exercised ongoing and systemic control over operations sufficient to establish an agency relationship with Comfort Inn, Comfort Suites,

---

[88] *Belinda Luscombe*, Time.com, *How To Spot A Human Trafficking Victim At A Hotel* (Oct. 28, 2014), http://time.com/3525640/sex-trafficking-victim-prostitution-hotel/.

and Quality Inn.

j.  Defendant Choice was in an agency relationship with the Comfort Inn, Comfort Suites, and Quality Inn hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Choice's exercise of an ongoing and systemic right of control over Comfort Inn, Comfort Suites, and Quality Inn hotels by Defendant Choice's operations, including the means and methods of how Comfort Inn, Comfort Suites, and Quality Inn branded hotels conducted daily business through one or more of the following actions:

   i.  providing the software, hardware, and platforms where suspicious activity or other concerns should be addressed with the Brands;

   ii.  providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

   iii.  providing new hire orientation on human rights and corporate responsibility;

   iv.  providing training and education to La Quinta® branded hotels through webinars, seminars, conferences, and online portals

   v.  providing and controlling customer review and response platforms;

   vi.  hosting online bookings on Defendant Choice's domain;

   vii.  requiring Comfort Inn, Comfort Suites, and Quality Inn branded hotels to use Defendant Choice's customer rewards program;

   viii.  requiring Comfort Inn, Comfort Suites, and Quality Inn branded hotels to use Defendant Choice's property management software;

   ix.  requiring Comfort Inn, Comfort Suites, and Quality Inn branded

hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x. providing IT support for all property management systems, owned, operated and required by Choice;

xi. setting employee wages;

xii. making employment decisions;

xiii. advertising for employment;

xiv. sharing profits;

xv. standardized training methods for employees;

xvi. building and maintaining the facility in a manner specified by the owner;

xvii. the ability of Defendant Choice to cancel any agreement with the Comfort Inn, Comfort Suites, and Quality Inn, if rules are violated;

xviii. regular inspection of the Comfort Inn, Comfort Suites, and Quality Inn hotels and operations or management by Defendant Choice

xix. standardized or strict rules of operation;

xx. regular inspection of the facility and operation by owner;

xxi. fixing prices; or

xxii. other actions that deprive Comfort Inn, Comfort Suites, and Quality Inn brand hotels of independence in business operations.

k. An apparent agency relationship also exists between Defendant Choice and the Comfort Inn, Comfort Suites, and Quality Inn hotels where Plaintiff was trafficked for sex. Defendant Choice represented to the public that the Comfort

Inn, Comfort Suites, and Quality Inn hotels had the authority to act on its behalf.

l. Comfort Inn® & Executive Suites, Comfort Suites®, and Quality Inn® & Suites branded hotels' websites are hosted at www.choicehotels.com.

m. When staying at Comfort Inn, Comfort Suites, and Quality Inn branded hotels, guests receive Choice Rewards for bookings.

n. Given Defendant Choice's public statements on behalf of Comfort Inn, Comfort Suites, and Quality Inn branded hotels and the control it assumed in educating, implementing, and directing its Comfort Inn, Comfort Suites, and Quality Inn branded hotels, including Defendant's Comfort Inn, Comfort Suites, and Quality Inn where Plaintiff A.D. was trafficked for sex, Defendant Choice failed to address and prevent human trafficking on its Comfort Inn, Comfort Suites, and Quality Inn branded properties, including but not limited to the following ways:

    i. did not adequately distribute information to assist employees in identifying human trafficking;

    ii. failed to mandate a process for escalating human trafficking concerns within the organization;

    iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv. failed to provide new hire orientation on human rights and corporate responsibility;

    v. failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi. failed to develop and hold or require ongoing training sessions on human trafficking;

vii. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii. failed to evaluate universal reservation systems for suspicious booking activities;

ix. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x. failed to ban cash or prepaid credit cards as payment; and

xi. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

o. Comfort Inn, Comfort Suites, and Quality Inn are alter egos, representatives, agents, or co-conspirators of Defendant Choice. Defendant Choice exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of Comfort Inn, Comfort Suites, and Quality Inn where Plaintiff A.D. was trafficked for sex.

p. Additionally, Defendant Choice has been aware of sex trafficking on Comfort Inn®, Comfort Suites®, and Quality Inn® brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Comfort Inn®, Comfort Suites®, and Quality Inn® brand properties and Defendant Choice's

inattentiveness, for example:

i.    In November of 2012, a reviewer described the Quality Inn in Jacksonville, Florida as follows: "As we pull up we have a perfect first impression of one of the local " working " girls heading out to make a buck off a tractor trailer driver. The room had dirty towels on the floor in the corner but the staff was great."[89]

ii.    In March 2015, one reviewer stated: "…Very strange. A traveling friend of ours on the 1st floor heard a knock from the patio sliding door Friday night. When he pulled back the drapes, three guys (possibly drunk from the bar) told them they were there to rob him and wanted his money. An awful experience all around. I was super glad to leave. Avoid at all costs."[90]

iii.    In September of 2016, police responded to a Quality Inn in Oak Grove, Kentucky where a young girl was being held against her will and forced to solicit sexual acts. The hotel staff had knowledge of the sex trafficking.[91]

iv.    In August 2017, one reviewer stated: "…Oh AND. Two days in a row, there was a shady homeless girl who kept hanging around the lobby and would ask us for money every time we walked in and out the front entrance. So that was... interesting. Not sure why the hotel let her loiter

---

[89] Review of Quality Inn Orange Park Jacksonville, available at https://www.orbitz.com/Jacksonville-Hotels-Quality-Inn-Orange-Park-Jacksonville.h10686.Hotel-Information

[90] Review of Quality Inn® & Suites Golf Resort; located at https://www.tripadvisor.com/Hotel_Review-g34467-d85226-Reviews-or55-Quality_Inn_and_Suites_Golf_Resort-Naples_Florida html#REVIEWS

[91] *Oak Grove Police sergeant, 2 others arrested during prostitution investigation*, CLARKSVILLENOW.COM (Sept. 28, 2016), *available at* https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/

in the parking lot and in the lobby area for two days straight, but it made us uncomfortable. Because every time we walked in or out, we knew she was going to give us her story about how her boyfriend just left her in this town and she has no money blah blah blah…"[92]

v.      In January 2018, one reviewer stated: "We stayed for two nights while visiting Naples. Location is not bad and there is plenty of parking but it is the least likely site for a golf resort. The area around the hotel seemed a bit odd with people who did not appear to belong to the hotel wandering around. It seemed to me that there was a block of apartments in the car park. I did not feel 100% safe. The room was fine, a bit tired but it did the trick. One area the place really lets itself down is the check-in staff. They were not friendly and seemed bored by the whole thing. Would not stay again. Naples has better to offer."[93]

vi.     In March of 2018, Police responded to a call at the Quality Inn in Camarillo, CA, where A 51-year-old woman was found being held against her will and sex trafficked. Through a criminal investigation, authorities learned one of the hotel clerks was aware of the trafficking and aided in its occurrence.[94]

vii.    In July 2018, one reviewer stated: "This hotel is in the seedy part of Naples. It is by some apartments that are not desirable. The hotel

[92] Review of Comfort Inn® & Executive Suites – Naples; located at https://www.tripadvisor.com/Hotel_Review-g34467-d85216-Reviews-or10-Comfort_Inn_Executive_Suites-Naples_Florida html#REVIEWS
[93] Review of Quality Inn® & Suites Golf Resort; located at https://www.tripadvisor.com/Hotel_Review-g34467-d85226-Reviews-or20-Quality_Inn_and_Suites_Golf_Resort-Naples_Florida html#REVIEWS
[94] One arrested in human trafficking attempt in Camarillo, VCSTAR.COM (Apr. 5, 2018), available at https://www.vcstar.com/story/news/local/communities/camarillo/2018/04/05/one-arrested-human-trafficking-attempt-camarillo/492228002/

pictures on internet are misleading. Rooms are extremely dated back to 1960's. TV was from the 1980's. Rooms smelt that they had been smoked in and hotel changed to where they are nonsmoking. Bathroom water pressure was very low and hot water was almost none. Pricing was high for what they offered. Did not feel safe. Will not be staying here again."[95]

    viii.    In March 2021, one reviewer stated: "Nice motel, but bar was very shady...... me and my son ordered food from the Tiki Bar located by the swimming pool..... we went down to pick up our food and the bar was full of rowdy bikers that I believe we're friends of the bartenders.... my son was terrified as they start showing each other their guns and knives as they were consuming lots of whiskey..... I called the motel three times the next day to complain each time I was told the manager would call me back and she never did finally when I did get ahold of her after calling four times she pretty much said that I was a liar and none of that would have happened there for making me think she was Friends of the patrons also.... I asked her if she had looked at the videos and she had stated that she had not but she trusted her workers side of the story..... told her I was going to leave a bad review on here and she said who cares...... like I said very nice Motel a very very shady bar and the management does not care....."[96]

[95] Review of Quality Inn® & Suites Golf Resort; located at https://www.tripadvisor.com/Hotel_Review-g34467-d85226-Reviews-or10-Quality_Inn_and_Suites_Golf_Resort-Naples_Florida html#REVIEWS

[96] Review of Comfort Inn® & Executive Suites – Naples; located at https://www.tripadvisor.com/Hotel_Review-g34467-d85216-Reviews-Comfort_Inn_Executive_Suites-Naples_Florida.html#REVIEWS

q. Upon information and belief, the branded properties depend on Defendant Choice for notification of negative customer reviews.

r. Upon information and belief, Defendant Choice, not the branded properties, houses and controls the data regarding customer reviews.

s. For years, both before and after adopting the Code, Defendant Choice has demonstrated willful blindness to the rampant culture of sex trafficking which tragically occurs on its Comfort Inn, Comfort Suites, and Quality Inn branded properties throughout the country. This same entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff A.D. at Comfort Inn, Comfort Suites, and Quality Inn hotels that forms the basis of this complaint.

115. **BEST WESTERN INTERNATIONAL, INC. ("BWI")**

a. Defendant BWI owns, supervises, or operates the Best Western® located at 4400 Ford Street, Fort Myers, Florida 33916 and the Best Western® located at 6400 Dudley Drive, Naples, Florida 34105. BWI previously owned, supervised and/or operated the Best Western® that was located at 27991 Oakland Drive, Bonita Springs, Florida 34135. BWI failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b. Defendant BWI had actual knowledge of sex trafficking occurring on its branded hotel properties because BWI and Best Western knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and

coercion. BWI and Best Western allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and Best Western facilitated the trafficking through its practices, policies, and procedures. BWI and Best Western failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and Best Western could continue to profit from the business that trafficking brings, including business from out-of-state.

c. Defendant BWI had constructive knowledge of sex trafficking occurring on its branded hotel properties because BWI and Best Western knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and Best Western allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and Best Western facilitated the trafficking through its practices, policies, and procedures. BWI and Best Western failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and Best Western could continue to profit from the business that trafficking brings, including business from out-of-state.

d. BWI knew or should have known that the Best Western® hotel where Plaintiff A.D. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

e. Best Western brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country. Rather than take timely and effective measures to prevent human trafficking, Best Western brand hotels, and their respective parent companies, have instead failed to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

f. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant BWI has repeatedly failed to stop these actions.

g. BWI was in an agency relationship with Best Western® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant BWI's exercise of an ongoing and systemic right of control over Best Western® hotels by Defendant BWI operations, including the means and methods of how Best Western® branded hotels conducted daily business through one or more of the following actions:

 i. providing the software, hardware, and platforms where suspicious activity or other concerns should be addressed with the Brands;

 ii. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

 iii. providing new hire orientation on human rights and corporate responsibility;

 iv. providing training and education to Best Western® branded hotels

through webinars, seminars, conferences, and online portals;

v.  providing and controlling customer review and response platforms

vi.  hosting online bookings on Defendant BWI's domain;

vii.  requiring Best Western® branded hotels to use Defendant BWI's customer rewards program;

viii.  requiring Best Western® branded hotels to use Defendant BWI's property management software;

ix.  requiring Best Western® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.  providing IT support for all property management systems, owned, operated and required by BWI;

xi.  setting employee wages;

xii.  making employment decisions;

xiii.  advertising for employment;

xiv.  sharing profits;

xv.  the ability of Defendant BWI to cancel any agreement with the Best Western® if rules are violated;

xvi.  regular inspection of the Best Western® hotels and operations or management by Defendant BWI;

xvii.  standardized training methods for employees;

xviii.  building and maintaining the facility in a manner specified by the owner;

xix.  standardized or strict rules of operation;

xx. regular inspection of the facility and operation by owner;

xxi. fixing prices; or other actions that deprive Best Western® branded hotels of independence in business operations.

h. An apparent agency also exists between Defendant BWI and Best Western® hotels. Defendant BWI held out Best Western® branded hotels to the public as possessing authority to act on its behalf.

i. Given Defendant BWI's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Best Western® branded hotels, Defendant BWI breached its duties in the following ways:

i. did not adequately distribute information to assist employees in identifying human trafficking;

ii. failed to mandate a process for escalating human trafficking concerns within the organization;

iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

iv. failed to provide new hire orientation on human rights and corporate responsibility;

v. failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi. failed to develop and hold or require ongoing training sessions on human trafficking;

vii. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii. failed to evaluate universal reservation systems for suspicious booking activities;

ix. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x. failed to ban cash or prepaid credit cards as payment; and

xi. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

j. For years, Defendant BWI has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Best Western® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at Best Western® hotels that forms the basis of this complaint.

i. In July 2007, a manager of two Best Western hotels publicly announced that they had banned "prostitution related activities" on their premises, which included training employees how to identify prostitution and denying entry to suspected prostitutes and their clients.[97]

ii. In October 2007, a Best Western construction in the middle of an

---

[97] *Businesses Say No to Sex Tourism Industry*, THE TICO TIMES (Jul. 27, 2007), https://ticotimes net/2007/07/27/businesses-say-no-to-sex-tourism-industry.

industrial area raised concerns from the local community about the hotel becoming a den of prostitution. Community board members and residents requested the hotel's owner to answer all of their questions about the site and provide details about the rooms, management, parking, and security. The building of hotels in industrial areas had become such a problem that the Borough President had called for a moratorium on such facilities in industrial areas.[98]

iii. In October 2008, two women were arrested on drug charges in a prostitution sting and eight men were arrested for soliciting sex at the Best Western Hotel in Rockland.[99]

iv. In April of 2010, the Christian Brothers Investment Services ("CBIS"), members of the Interfaith Center on Corporate Responsibility, and 300 investors and faith-based organizations sent a letter to major hotel chains, including Best Western, to learn about actions being taken to combat human trafficking in advance of the World Cup. The final results of the initiative specifically noted that Defendant BWI "lack[s] programs to deal with child sexual exploitation."[100] CBIS' efforts were applauded by BWI, but ultimately ignored as BWI deflected its responsibility to prevent human

---

[98] *Residents worry hotel may become den of prostitution*, NY DAILY NEWS (Oct. 30, 2007), https://www.nydailynews.com/new-york/bronx/residents-worry-hotel-den-prostitution-article-1.232160
[99] *One alleged prostitute is a former Marshfield High honor student*, THE PATRIOT LEDGER (Oct. 28, 2008), https://www.patriotledger.com/article/20081028/NEWS/310289571.
[100] Christian Brothers Investment Services, *Final Results of the Initiative On Hotels and Human Trafficking at the World Cup*, at 2 (2010).

trafficking elsewhere.[101]

    v.    In December of 2013, authorities caught a man trafficking women from his jail cell. The man would post online advertisements of the girls and send them to service clients at the Best Western in Rockville, Maryland.[102]

    vi.    In October of 2017, a man plead guilty to trafficking a 16 year-old girl out of a Best Western in Arlington, Virginia. The man trafficked the minor through numerous states, posted advertisements of her online, and took all of the profit.[103]

k.    Additionally, Defendant BWI has been aware of sex trafficking on Best Western brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Best Western brand properties and Defendant BWI's inattentiveness, for example:

    i.    In January of 2013, a reviewer described the Best Western in Galveston, Texas as follows: "There was criminal activity in the parking lot - prostitutes and our car was broken in to and the gas and gas cap were actually stolen!"[104]

    ii.    Regarding a March 2016 stay at a Best Western Executive Inn in

---

[101] Response of Best Western International to the appeal of Christian Brothers Investment Services to take action to prevent human trafficking in South Africa, *available at* https://www.business-humanrights.org/sites/default/files/reports-and-materials/Best-Western-response-re-CBIS-trafficking-appeal-3-June-2010.doc

[102] *Inmate May Have Run Prostitution Ring From Jail*, NBC WASHINGTON, (Dec. 18, 2013), available at https://www.nbcwashington.com/news/local/inmate-may-have-run-prostitution-ring-from-jail/2042829/

[103] *Pimp Pleads Guilty to Sex Trafficking Teen in Arlington*, ARLNOW.com (Oct. 20, 2017), available at https://www.arlnow.com/2017/10/20/pimp-pleads-guilty-to-sex-trafficking-teen-in-arlington/

[104] Review of the Best Western Plus (Jan. 25, 2013), available at https://www.tripadvisor.com/ShowUserReviews-g55879-d223635-r150605283-Best_Western_Plus_Seawall_Inn_Suites_By_The_Beach-Galveston_Galveston_Island_Texas html

Seagoville, Texas, a customer wrote: "…At night there was a pimp and prostitute argument and the front desk allowed this to happen. Very loud until early in the morning. The front desk allows prostitution at night. Told the morning shift about it they didn't care…"[105]

l. Upon information and belief, Defendant BWI monitors customer reviews and complaints for all brand properties.

m. Upon information and belief, the branded properties depend on Defendant BWI for notification of negative customer reviews.

n. Upon information and belief, Defendant BWI, not the branded properties, houses and controls the data regarding customer reviews.

116. **MARRIOTT INTERNATIONAL, INC. ("MARRIOTT"):**

a. Defendant Marriott owns, supervises, or operates the Fairfield Inn® & Suites located at 3804 White Lake Boulevard, Naples, Florida 34117. Marriott failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b. Defendant Marriott owns, supervises, or operates the SpringHill Suites® located at 3798 White Lake Boulevard, Naples, Florida 34117. Marriott failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

c. Defendant Marriott voluntarily assumed the responsibility to implement

---

[105] Review of Best Western Executive Inn, Seagoville, TX (Mar. 23, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g56648-d73227-r357822545-Best_Western_Executive_Inn-Seagoville_Texas.html.

sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Marriott failed to implement its own policies and those recommended to it by the above mentioned advocacy organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of A.D.[106]

d. Upon information and belief, Plaintiff alleges that Marriott implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

e. Defendant Marriott knew of sex trafficking occurring on its branded hotel properties. Marriott, Fairfield Inn®, and SpringHill Suites® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott, Fairfield Inn®, and SpringHill Suites® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet, Marriott, Fairfield Inn®, and SpringHill Suites® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Fairfield Inn® and SpringHill Suites®. Specifically, Marriott, Fairfield Inn®, and SpringHill Suites® facilitated the trafficking through its practices,

---

[106] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

policies, and procedures. Marriott, Fairfield Inn®, and SpringHill Suites® failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott, Fairfield Inn®, and SpringHill Suites® could continue to profit from the business that trafficking brings, including business from out-of-state.

f.  Defendant Marriott should have known of sex trafficking occurring on its branded hotel properties. Marriott, Fairfield Inn®, and SpringHill Suites® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott, Fairfield Inn®, and SpringHill Suites® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet Marriott, Fairfield Inn®, and SpringHill Suites® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Fairfield Inn® and SpringHill Suites®. Marriott, Fairfield Inn®, and SpringHill Suites® facilitated the trafficking through its practices, policies, and procedures. Marriott, Fairfield Inn®, and SpringHill Suites® failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott, Fairfield Inn®, and SpringHill Suites® could continue to profit from the business that trafficking brings, including business from out-of-state.

g.  Marriott knew or should have known that the Fairfield Inn® and SpringHill Suites® hotel where Plaintiff A.D. was trafficked was an area known for high

incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

h. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Marriott has repeatedly failed to stop these actions.

i. Marriott was in an agency relationship with Fairfield Inn® and SpringHill Suites® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Marriott's exercise of an ongoing and systemic right of control over Fairfield Inn® and SpringHill Suites® hotels by Defendant Marriott's operations, including the means and methods of how Fairfield Inn® and SpringHill Suites® branded hotels conducted daily business through one or more of the following actions:

    i. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

    ii. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

    iii. providing new hire orientation on human rights and corporate responsibility;

    iv. providing training and education to Fairfield Inn® and SpringHill Suites® branded hotels through webinars, seminars, conferences, and online portals;

    v. providing and controlling customer review and response platforms;

vi.     hosting online bookings on Defendant Marriott's domain;

vii.    requiring Fairfield Inn® and SpringHill Suites® branded hotels to use Defendant Marriott's customer rewards program;

viii.   requiring Fairfield Inn® and SpringHill Suites® branded hotels to use Defendant Marriott's property management software;

ix.    requiring Fairfield Inn® and SpringHill Suites® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.    providing IT support for all property management systems, owned, operated and required by Marriott;

xi.    setting employee wages;

xii.   making employment decisions;

xiii.  advertising for employment;

xiv.  sharing profits;

xv.   requiring Fairfield Inn® and SpringHill Suites® branded hotels to use Defendant Marriott's property management software;

xvi.  requiring airfield Inn® and SpringHill Suites® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

xvii. providing IT support for all property management systems, owned, operated and required by Marriott;

xviii. standardized training methods for employees;

xix.  building and maintaining the facility in a manner specified by the

owner;

xx. standardized or strict rules of operation;

xxi. regular inspection of the facility and operation by owner;

xxii. fixing prices; or

xxiii. other actions that deprive Fairfield Inn® and SpringHill Suites® branded hotels of independence in business operations.

j. Upon information and belief, Defendant Marriott could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Marriott's management and control and included all of the indicia of A.D.'s trafficking. This data included the details of A.D.'s check-in, the internet activity associated with her reservation, including access to Backpage.com to post advertisements from the hotel, access to other online websites known for sexual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

k. An apparent agency also exists between Defendant Marriott, Fairfield Inn®, and SpringHill Suites® hotels. Defendant Marriott held out Fairfield Inn® and SpringHill Suites® branded hotels to the public as possessing authority to act on

its behalf. Defendant Marriott clothed the Fairfield Inn® and SpringHill Suites® with apparent authority to act for Defendant Marriott in the following ways: by requiring the use of Marriott signs, providing Marriott branded stationery, requiring the use of Marriott's website and Marriott's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Marriott guest rewards programs. On information and belief, Defendant Marriott's conduct reasonably led A.D.'s perpetrator to believe that the Fairfield Inn® and SpringHill Suites® had the authority it purported to have, and A.D. was injured as a result.

l. Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Fairfield Inn® and SpringHill Suites® branded hotels, Defendant Marriott breached its duties in the following ways:

    i.     did not adequately distribute information to assist employees in identifying human trafficking;

    ii.    failed to mandate a process for escalating human trafficking concerns within the organization;

    iii.   failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv.   failed to provide new hire orientation on human rights and corporate responsibility;

    v.    failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online

portals;

vi. failed to develop and hold or require ongoing training sessions on human trafficking; or

vii. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii. failed to evaluate universal reservation systems for suspicious booking activities;

ix. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x. failed to ban cash or prepaid credit cards as payment; and

xi. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

m. Upon information and belief, Defendant Marriott requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Marriott specifies and requires.[107]

n. Upon information and belief, Defendant Marriott requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Marriott access to the internet data.

o. Defendant Marriott states in its privacy policy that it collects the following

---

[107] See https://blueportwireless.com/gpns-certified/ ("On May 22, 2013, Blueport Wireless becomes the first vendor to be certified in the 2013 Marriott Global Property Network Standard."); see also https://www.deepbluecommunications.com/industries/hotel-wifi/marriott/ ("Deep Blue has been a Marriott GPNS Certified Hotel WiFi Vendor since 2011.")..

categories of information from hotel guests: contact information such as name, gender, postal address, telephone number, email address; financial information such as credit and debit card number or other payment data; date and place of birth; membership or loyalty program data; social media account IDs, profile photos or data made available by linking social media and loyalty accounts; biometric data; images and video and audio data via security cameras in public areas and body-worn cameras carried by loss prevention officers and other security personnel; and other technological data including a customer's browser or device, data collected when downloading or using an app; cookies that collect data such as time spent on online services, pages visited, and IP addresses.[108]

p. Defendant Marriott retains and can view internet access, which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

q. Marriott's centralized property management system[109] also gains Marriott access to hotels guest information registration, including names, date of booking, and length of stay.

r. Upon information and belief, Defendant Marriott can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when

---

[108] *See* Marriott International, Inc.'s Privacy Policy, *available at*  https://www.marriott.com/about/privacy mi#data-covered

[109] *See, e.g.,* Marriott International Selects Cloud-based MICROS OPERA as Its Next-Generation Property Management System for all North America Properties, *available at* https://www.prnewswire.com/news-releases/marriott-international-selects-cloud-based-micros-opera-as-its-next-generation-property-management-system-for-all-north-america-properties-204731811.html

bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

s. Upon information and belief, Defendant Marriott has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[110]

t. Upon information and belief, Defendant Marriott can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

u. Upon information and belief, and contrary to ECPAT best practices, Defendant Marriott failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

v. Upon information and belief, Defendant Marriott's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Fairfield Inn® and SpringHill Suites® hotels where Plaintiff was trafficked for sex.

w. Despite access to information comprising clear sex trafficking indicators, Defendant Marriott continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

x. Upon information and belief, Defendant Marriott monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

---

[110] *See* Marriott to Pay $600,000 to Resolve Wi-Fi Blocking Investigation, *available at* https://assets.documentcloud.org/documents/1308852/doc-329743a1.pdf*; see also, e.g.*, https://traveltips.usatoday.com/hotels-track-internet-usage-111659.html ("the hotel's server usually has a log file that lists every connection the server makes for its users while they browse using its network.").

y. Upon information and belief, Defendant Marriott provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Marriott controls and houses this collective data from all branded properties.

z. Thus, for several years, Defendant Marriott has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Fairfield Inn® and SpringHill Suites® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at Fairfield Inn® and SpringHill Suites® hotels that forms the basis of this complaint. For example:

  i. In Oak Creek, WI, "[a]ccording to police reports, an employee from the Fairfield Inn called the police, saying that several men were entering and leaving a room in the building, and suspected there might be a prostitution operation taking place inside."[111]

  ii. In Fairview Township, PA,"[t]he woman, later identified as Dowdell, agreed to meet an undercover detective at the Fairfield Inn and Suites. When Dowdell arrived at the room, she looked around the entire interior and then asked the detective for $180. The detective gave her $200, and she hugged him and patted him down."[112]

  iii. In Newnan, GA, "[a] two-day prostitution sting conducted at the

---

[111] *Prostitution Operation Busted at Fairfield Inn: Report*, PATCH MEDIA (Mar. 31, 2018) *available at* https://patch.com/wisconsin/oakcreek/prostitution-operation-busted-fairfield-inn-report
[112] *Wrightsville man, two women busted for prostitution,* YORK DAILY RECORD (Oct. 18, 2016) *available at* https://www.ydr.com/story/news/crime/2016/10/18/more-alleged-prostitutes-busted-hotels-cops-say/92352000/

SpringHill Suites by Marriott (1119 Bullsboro Dr), resulted in a victim of human trafficking being rescued."[113]

    iv.    In St. Paul, WI, – "[a]ccording to the criminal complaint, Christner knew about Christoff because he hired her as a prostitute. She met Christoff at the SpringHill Suites at 472 Jackson St. in St. Paul on Aug. 28."[114]

    v.    In Chicago, IL, "Lavarius McFadden used a messaging app to set up a meeting with Elizabeth Long at the SpringHill Suites by Marriott on March 14, but claimed he was unaware that she was a prostitute, Assistant State's Attorney James Murphy said during a bond hearing at the Leighton Criminal Courthouse."[115]

    vi.    In March of 2011, a New Hampshire sportswriter was arrested for running a prostitution ring from advertisements on craigslist, charging clients $240 an hour. Employees at the SpringHill Suites in Andover, New Hampshire contacted the police about the man, resulting in the police conducting a sting at their hotel.[116]

    vii.    In April of 2012, a woman sued a Marriott Hotel in Boston, Massachusetts after a man responded to a craigslist advertisement

---

[113] *21 charged with prostitution, pimping after two-day sting at Newnan SpringHill Suites* THE GEORGIA GAZETTE (June 25, 2020) *available at* https://thegeorgiagazette.com/coweta/21-charged-with-prostitution-pimping-after-two-day-sting-at-newnan-springhill-suites/

[114] *2 more charged with murder in downtown St. Paul hotel shooting of prostitute's customer,* TWINCITIES PIONEER PRESS.COM (Nov. 4, 2021) *available at* https://www.twincities.com/2021/11/04/two-more-charged-in-fatal-springhill-suites-shooting-charges-say-a-prostitute-targeted-st-paul-man-for-robbery/

[115] *Man held without bond for allegedly murdering sex worker at River North hotel* CHICAGO SUN TIMES (Apr. 27, 2020) available at https://chicago.suntimes.com/crime/2020/4/27/21238813/lavarius-mcfadden-first-degree-murder-springhill-suites-river-north-dearborn-street-chicago

[116] Caparell, Adam, Award-winning journalist sentenced to prison for running prostitution ring in New England hotel room (Mar. 22, 2011), available at https://www.nydailynews.com/news/national/award-winning-journalist-sentenced-prison-running-prostitution-ring-new-england-hotel-room-article-1.120186

soliciting sex and killed her daughter within the hotel in a violent attack. The woman said hotels should be doing more to curb prostitution.[117]

viii. In June of 2012 a Professor from the University of Georgia was arrested at a SpringHill Suites in Athens, Georgia after police discovered he had been purchasing sex from online advertisements. The man responded to an ad posted by an undercover police officer and was taken into custody when he arrived at the hotel.[118]

aa. Additionally, Defendant Marriott has been aware of sex trafficking and guest safety issues on Fairfield Inn® and SpringHill Suites® brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking and guest safety issues on Fairfield Inn® and SpringHill Suites® brand properties and Defendant Marriott's inattentiveness, for example:

i. In November of 2021, a reviewer described staff at the Fairfield Inn and Suites in Naples as "rude and uninformed," indicating that the back entrance door stayed open at all times, that safety measures were ignored, and that staff remained indifferent to guest safety and questions.[119]

ii. In May of 2021, a reviewer brought attention to a safety issue at the

[117] Mother of Craigslist victim sues Marriott, THE BOSTON GLOBE (Apr. 2012), available at https://www3.bostonglobe.com/metro/2012/04/13/mother-woman-slain-craigslist-killer-sues-marriott-hotel-chain/LxuP2jZtY59DsxMTZXJ09H/story html?arc404=true

[118] https://www.ajc.com/news/local/uga-academic-charged-prostitution-sting/KLzLbi9mrZJviLBnuGJIDM/

[119] Review of Fairfield Inn and Suites by Marriott Naples (Nov. 1, 2021), available at https://www.booking.com/hotel/us/fairfield-inn-and-suites-by-marriott-naples-two.html#tab-reviews

Fairfield Inn and Suites in Naples: "side door lock wasn't operational so basically anyone could access to (sic) the hotel."[120]

    iii.    In June of 2021, a reviewer mentioned that during their stay, their vehicle was broken into. The police officer told the reviewer that due to poor guest safety measures and lack of security, the hotel was a "prime target for smash and grab thieves" and that the security door at the far end of the hotel would not latch, allowing anyone to come into the hotel.[121]

    bb.  Upon information and belief, Defendant Marriott monitors customer reviews and complaints for all brand properties.

    cc.  Upon information and belief, the branded properties depend on Defendant Marriott for notification of negative customer reviews.

    dd.  Upon information and belief, Defendant Marriott, not the branded properties, house and control the data regarding customer reviews.

### C.     THE SEX TRAFFICKING OF A.D. AT DEFENDANT HOTELS

117. One of the lives devalued and otherwise adversely affected by the hospitality industry's inattention to the prevention and eradication of sex trafficking was that of A.D.

118. In November of 2011, A.D. met a man who she was interested in ("hereinafter referred to as "N.M.""). He took advantage of her innocence and forced her into a sexual encounter. N.M. subsequently courted her and manipulated her into thinking they were in love. While "dating," N.M. would manipulate A.D. into numerous non-consensual sexual encounters; forced her to take

---

[120] Review of Fairfield Inn and Suites by Marriott Naples (May 27, 2021), available at https://www.booking.com/hotel/us/fairfield-inn-and-suites-by-marriott-naples-two.html#tab-reviews.
[121] Review of Fairfield Inn and Suites by Marriott Naples (Jun. 21, 2021), available at https://www.expedia.com/Naples-Hotels-Fairfield-Inn-Suites-By-Marriott-Naples h2733223.Hotel-Information?pwaDialog=reviews-property-reviews-1

drugs; and take the blame for his criminal acts. N.M. would consistently take advantage of A.D. and would soon traffick her in hotels throughout Central Florida.

119. After months of "dating," N.M. suggested A.D. move in together. Because he was a convicted felon and registered sex offender, he forced A.D. to enter into a lease agreement. In order to make money to sustain their life together, N.M. suggested A.D. work to make extra money.

120. Under the ruse of a modeling job advertised on Backpage.com, N.M. forced A.D. to work. During her "interview" for the modeling job, A.D. met a man (hereinafter referred to as "S.L.") who raped her into submission at the Best Western Naples.

121. While victimized by her traffickers, A.D. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotel properties between February 2012 and August 2012.

**The Sex Trafficking of A.D. at the Wyndham® Tampa Westshore**

122. Plaintiff was subjugated to sex trafficking at the Wyndham® Tampa Westshore ("Wyndham Tampa Westshore"), currently a Holiday Inn Tampa Westshore, located at 700 N. Westshore Blvd., Tampa, Florida 33609, between approximately February 2012 to March 2012.

123. N.M. instructed A.D. to rent rooms in her name using cash. A.D. was required to pay for the room on a nightly basis. In the morning, A.D. would request to extend their stay for a subsequent night.

124. N.M. forced A.D. to perform commercial sex acts for approximately one week continuously at the Wyndham Tampa Westshore.

125. N.M. advertised A.D. on Backpage.com, which would include the name and address of the Wyndham Tampa Westshore hotel.

126. N.M. developed relationships with several of the Wyndham Tampa Westshore

employees and had illicit agreements with them to conceal their sex trafficking operation. Within the first 24 hours of being at the Wyndham Tampa Westshore, A.D. was forced to perform commercial sex acts with up to 18 to 20 men. The sex buyers would enter the hotel through the front lobby in clear view of the front desk between the peak hours of 11:00pm to 5:00am. Accordingly, the traffic and parade of unregistered male guests coming in and out of A.D.'s hotel room was tremendous. This procession of men would have been open and obvious to anyone working at the Wyndham Tampa Westshore.

127. For the remainder of the days that A.D. was trafficked at the Wyndham Tampa Westshore, A.D. was raped by up to 12 to 15 men per day. Over a week period, in excess of 100 men arrived at the Wyndham Tampa Westshore rooms to forcefully rape A.D.

128. The only time A.D. was allowed to leave her room was to go down to the front lobby to extend her stay. Because she was confined to her hotel room for several days at a time, her trafficker would bring food to the room. To keep her confined and unable to escape, her trafficker would arrange buyers to come to the hotel room and tell them which room to go to.

129. A.D.'s trafficker, N.M., would stay with A.D. at the Wyndham® Tampa Westshore. On several occasions he would sit in the parking lot while A.D. was raped. After each client, N.M. would return to the rented room to collect the cash.

130. When housekeeping was near the rented room, A.D. would hand housekeeping large piles of dirty linens and towels and request additional clean linens, towels, and 8 to 10 hand towels at a time.

131. The Wyndham Tampa Westshore security cameras undoubtedly filmed a great deal of this obvious traffic as well as the victim A.D. as she entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent

the flagrant sex trafficking of A.D. from occurring on the Wyndham Tampa Westshore hotel premises.

132. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

a. Large amounts of exposed used condoms in the bathroom trash can, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

d. A continuous procession of men entering and leaving A.D.'s room;

e. Excessive requests for sheets, cleaning supplies, towels, and room service;

f. The personal relationship between various hotel staff and A.D.'s trafficker; and

g. The direct employee encounters with A.D. and her trafficker inside the Wyndham Tampa Westshore.

**The Sex Trafficking of A.D. at the La Quinta® by Wyndham Naples Downtown**

133. Plaintiff was subjugated to sex trafficking at the La Quinta® by Wyndham Naples Downtown ("La Quinta Naples Downtown") located at 1555 5th Ave S, Naples, FL 34102, between approximately March of 2012 to July 2012.

134. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

135. For approximately four months, N.M. routinely had A.D. rent three rooms on the same floor and cross from each other under her name using cash or a prepaid credit card. Often, N.M.

111

would force A.D. to request rooms overlooking the back parking lot to ensure they could see the buyers leaving the property and to ensure the coast was clear for the next buyer.

136. N.M. knew several of the employees at the La Quinta Naples Downtown, and had illicit arrangements with them to conceal their sex trafficking operation. When N.M. arrived at A.D.'s room, the maintenance employee would serve as a lookout and would notify N.M. if other traffickers were checking into the hotel. In return for their assistance, the La Quinta Inn Naples Downtown employees would frequently receive monetary compensation from N.M. Additionally, A.D. would often be forced to have sex with the hotel's maintenance man in exchange for his assistance.

137. A.D. was never allowed to leave the room. Because she was confined to her hotel room for several days at a time, N.M. would bring food to the room. To keep her confined and unable to escape, N.M. would arrange buyers to come to the hotel room. There was a parade of unregistered male guests walking into the hotel through the front lobby, coming in and out of her hotel room at all times of day. A.D. was sexually abused and exploited numerous times at the La Quinta Naples Downtown. This procession of men would have been open and obvious to anyone working at the La Quinta Naples Downtown.

138. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. Large amounts of exposed used condoms in the bathroom trash can, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

    c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and

inappropriate attire);

d. A continuous procession of men entering and leaving A.D.'s room;

e. Excessive requests for sheets, cleaning supplies, towels, and room service;

f. The personal relationship between various hotel staff and A.D.'s trafficker; and

g. The direct employee encounters with A.D. and her trafficker inside the La Quinta Naples Downtown.

**The Sex Trafficking of A.D. at the La Quinta® by Wyndham Tampa Bay Airport**

139. Plaintiff A.D. was subjugated to sex trafficking at the La Quinta® by Wyndham Tampa Bay Airport ("La Quinta Tampa Bay Airport") located at 4730 W Spruce St., Tampa, FL 33607 between approximately May 2012 to July 2012.

140. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

141. For approximately three months, A.D. rented rooms as instructed by N.M. under her name using cash or prepaid credit card.

142. A.D. was never allowed to leave the room. Because she was confined to her hotel room for several days at a time, N.M. would bring food to the room. To keep her confined and unable to escape, N.M. would arrange buyers to come to the hotel room. There was a parade of unregistered male guests coming in and out of her hotel room at all times of day. A.D. was sexually abused and exploited numerous times at the La Quinta Tampa Bay Airport. This procession of men would have been open and obvious to anyone working at the La Quinta Tampa Bay Airport.

143. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily

fluids on the sheets and towels, and other sex-related items in the hotel rooms;

b. Payments for the rooms in cash, or cash substitutes such as a prepaid Visa gift card;

c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

d. A continuous procession of men entering and leaving A.D.'s room;

e. Excessive requests for sheets, cleaning supplies, towels, and room service;

f. The personal relationship between various hotel staff and A.D.'s trafficker; and

g. The direct employee encounters with A.D. and her trafficker inside the La Quinta Naples Downtown.

**The Sex Trafficking of A.D. at the Comfort Inn & Executive Suites® by Choice Hotels**

144. Plaintiff A.D. was subjugated to sex trafficking at the Comfort Inn & Executive Suites® by Choice Hotels ("Comfort Inn") hotel located at 3860 Tollgate Blvd, Naples FL 34114 between approximately March 2012 to July 2012.

145. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

146. For approximately four months, N.M. routinely had A.D. rent rooms under her name using cash payments of approximately $100.00. The hotel did not require a credit card, so A.D. would pay the room deposit using cash. Often, N.M. would force A.D. to request rooms towards the back of the hotel near the stairways.

147. N.M. knew several employees at the Comfort Inn and had illicit agreements with them to help conceal their trafficking operation. Housekeepers would serve as lookouts and would notify N.M. if police came to the hotel.

148. A.D. was never allowed to leave the room. To keep her confined and unable to escape, N.M. would arrange buyers to come to the hotel room. There was a parade of unregistered male guests coming in and out of her hotel room at all times of the day. A.D. was sexually abused and exploited numerous times at the Comfort Inn. This procession of men would have been open and obvious to anyone working at the Comfort Inn.

149. A.D. attempted to escape from her trafficker at the Comfort Inn. She was caught trying to escape and was physically abused and assaulted by N.M. A.D.'s screams and pleas for help could be heard from inside the room.

150. During one stay, A.D. and N.M. were arrested at the hotel as a result of N.M.'s forced criminal activity. When released a day later, they risked going back to the hotel to get their $120 room cash deposit back. Hotel staff gave A.D. a plain white legal envelope with A.D.'s name and room number on it. Inside the envelope was $120 cash and a receipt.

151. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. payments for the rooms in cash or cash substitutes such as prepaid credit cards;

    c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

    d. a continuous procession of men entering and leaving A.D.'s room;

    e. excessive requests for sheets, cleaning supplies, towels, and room service;

    f. the personal relationship between various hotel staff and A.D.'s traffickers; and

    g. the direct employee encounters with A.D. and her trafficker inside the Comfort

Inn.

### The Sex Trafficking of A.D. at the Comfort Suites® by Choice Hotels

152. A.D. was subjugated to sex trafficking at the Comfort Suites® by Choice Hotels ("Comfort Suites") located at 4506 Oak Fair Blvd. Tampa, FL 33610, between approximately May 2012 to July 2012.

153. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located and a picture of A.D. that was taken inside the room at the Comfort Suites

154. For approximately two months, N.M. routinely instructed A.D. to rent multiple rooms in her name using cash. Often, N.M. would force A.D. to request rooms across the hall from each other, with one room facing the parking lot to ensure buyers left the property and to monitor when buyers would arrive.

155. A.D. was trafficked with other victims at this hotel. N.M. would arrange buyers to come to the hotel rooms. There would be a parade of unregistered male guests coming in and out of the hotel room at all times of day. A.D. was sexually exploited and abused numerous times at the Comfort Suites hotel. This procession of men would have been open and obvious to anyone working at the Comfort Suites.

156. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

   a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

   b. Payments for the rooms in cash or cash substitutes such as a prepaid credit card;

   c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and

116

inappropriate attire);

d.  A continuous procession of men entering and leaving A.D.'s room;

e.  Excessive requests for sheets, cleaning supplies, towels, and room service;

f.   The personal relationship between various hotel staff and A.D.'s trafficker; and

g.  The direct employee encounters with A.D. and her trafficker inside the Comfort Suites.

### The Sex Trafficking of A.D. at the Quality Inn & Suites® by Choice Hotels

157.  Plaintiff A.D was subjugated to sex trafficking at the Quality Inn & Suites® by Choice Hotels ("Quality Inn") located at 4100 Golden Gate Pkwy, Naples FL 34116, between approximately February 2012 to March 2012.

158.  N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

159.  N.M. required A.D. to routinely request the biggest suite at the hotel.

160.  For over a week, A.D. was confined to the suite and not allowed to leave.  N.M. would bring food to the room. To keep her confined and unable to escape, N.M. would arrange buyers to come to the hotel room. There was a parade of unregistered male guests coming in and out of her hotel room at all times of day. A.D. was sexually exploited and abused numerous times at the Quality Inn. This procession of men would have been open and obvious to anyone working at the Quality Inn.

161.  A.D. was instructed to post a Backpage ad using the hotel lobby computers. There was no office area in the lobby so N.M. stood behind her in an attempt to conceal their illicit activities and illicit photographs.

162.  During a stay at the Quality Inn, a housekeeper saw a gun, $10,000 dollars' cash,

cocaine, molly, and marijuana in the room while cleaning. To keep the housekeeper quiet, N.M. tipped the housekeeper $100.

163. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. Payments for the rooms in cash or cash substitutes, such as a prepaid credit card;

    c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

    d. A continuous procession of men entering and leaving A.D.'s room;

    e. Excessive requests for sheets, cleaning supplies, towels, and room service;

    f. The personal relationship between various hotel staff and A.D.'s trafficker; and

    g. The direct employee encounters with A.D. and her trafficker inside the Quality Inn.

**The Sex Trafficking of A.D. at the Best Western® Bonita Springs**

164. Plaintiff A.D. was trafficked at the Best Western® Bonita Springs, now Days Inn & Suites by Wyndham, located at 27991 Oakland Dr., Bonita Springs, FL 34135, between approximately March of 2012 to July 2012.

165. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

166. For approximately five months, at the direction of her trafficker, A.D. rented rooms at the Best Western® Bonita Springs for the purpose of selling A.D. for sex.

167. The room deposit was always paid in cash. When A.D. would check out, a Best

Western® Bonita Springs employee would do a "room check" where sex paraphernalia, such as used condoms, empty lube bottles, and excessive amounts of dirty towels and linens, was readily visible to the hotel employee conducting the "room check." A.D. would wait at the front desk during the "room check." The Best Western® Bonita Springs employee conducting the "room check" would inform the front desk that the room was "all clear," and the cash deposit would be returned to A.D.

168. N.M. developed relationships with several of the Best Western® Bonita Springs employees and had illicit arrangements with them to conceal their sex trafficking operation. A.D. would be forced to perform commercial sex acts with up to 5 to 12 men a day. Accordingly, the traffic and parade of unregistered male guests coming in and out of the Best Western® Bonita Springs was tremendous. This procession of men would have been open and obvious to anyone working at the Best Western® Bonita Springs.

169. A.D. was trafficked at the Best Western® Bonita Springs at a minimum three times a month between 2 to 3 nights each stay. Up to 5 to 12 sex buyers per stay arriving at the Best Western® Bonita Springs rooms rented for the purpose of sell A.D. for sex. A.D. was sexually exploited and abused numerous times at the Best Western® Bonita Springs.

170. A.D. was never allowed to leave the room. Because she was confined to her hotel room for several days at a time, her trafficker would bring food to the room. To keep her confined and unable to escape, her trafficker would arrange buyers to come to the hotel room and tell them which room to go to.

171. The sex buyers would have to enter and exit the Best Western® Bonita Springs through the front lobby in clear visibility of the front desk. The customers at this location were constant. On numerous occasions the front desk attendant would ask the sex buyers whether they were

visiting someone or staying at the hotel and would question A.D. or her trafficker why so many men would be going up to the room and that the cameras could see all the men visiting A.D.

172. A.D. would be instructed by her trafficker to keep her hotel room door open – with lock on the outside – to prevent the door from closing, so that buyers could easily identify which room she was staying in.

173. The Best Western® Bonita Spring security cameras undoubtedly filmed a great deal of this obvious traffic as well as the victim A.D. as she entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of A.D. from occurring on the Best Western® Bonita Springs hotel premises.

174. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

a. large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

d. a continuous procession of men entering and leaving A.D.'s room;

e. excessive requests for sheets, cleaning supplies, towels, and room service;

f. the personal relationship between the front desk employees, manager, and A.D.'s traffickers; and

g. the direct employee encounters with A.D. and her traffickers inside Best Western® Bonita Springs.

**The Sex Trafficking of A.D. at the Best Western® Fort Myers**

175.     Plaintiff A.D. was subjugated to sex trafficking at the Best Western® Fort Myers located at 4400 Ford St, Fort Myers, FL 33916, in February of 2012.

176.     S.L. rented rooms at the Best Western® Fort Myers for the purpose of selling A.D. for sex.

177.     S.L. forced A.D. to perform commercial sex acts for two consecutive days at the Best Western® Fort Myers. A.D. would come to the hotel early in the morning and leave in the evening to return the next morning.

178.     A.D. was forced to perform commercial sexual acts with up to 10 to 15 buyers a day. Accordingly, the traffic and parade of men – all white between the ages of 25 to 80 years old – coming in and out of the Best Western® Fort Myers was tremendous. Up to 30 men over a period of 2 days arriving at the Best Western® Fort Myers rooms rented by her trafficker.

179.     This procession of men would have been open an obvious to anyone working at the Best Western® Fort Myers. These sex buyers were not registered guests.

180.     While being forcefully raped by sex buyers at the Best Western® Fort Myers A.D. was not allowed to leave the hotel room. Instead, the trafficker would arrange buyers and tell them which room to go to.

181.     S.L. would stop by A.D.'s room to collect money multiple times a day after each "rush" of sex buyers.

182.     The Best Western® Fort Myers security cameras undoubtedly filmed a great deal of this obvious traffic as well as the victim A.D. as she entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of A.D. from occurring on the Best Western® Fort Myers hotel

premises.

183. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

   a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

   b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

   c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

   d. A continuous procession of men entering and leaving A.D.'s room;

   e. Excessive requests for sheets, cleaning supplies, towels, and room service;

   f. The personal relationship between various hotel staff and A.D.'s trafficker; and

   g. The direct employee encounters with A.D. and her trafficker inside the Best Western® Fort Myers.

**The Sex Trafficking of A.D. at the Best Western® Naples**

184. Plaintiff A.D. was subjugated to sex trafficking at the Best Western® Naples, located at 6400 Dudley Dr., Naples, Florida between approximately February 2012 to April 2012.

185. For approximately two months, A.D.'s trafficker or A.D., at the direction of her trafficker, rented rooms at the Best Western® Naples for the purpose of selling A.D. for sex.

186. At the Best Western® Naples, A.D. met S.L. under the pretense that she was being interviewed for a modeling job. She was forcefully raped into submission by S.L. Her main trafficker, N.M., threatened to hurt her family if she did not do as she was told.

187. S.L. forced A.D. to perform commercial sex acts for approximately two weeks continuously at the Best Western® Naples.

188. The hotel rooms were rented by S.L. under his name.

189. Each day, S.L. would move A.D. to a different hotel room at the Best Western® Naples.

190. Every day for two weeks, N.M. would bring A.D. to the Best Western® Naples early in morning and leave in the evening to return the next morning.

191. A.D. was forced to perform commercial sex acts with up to 10 to 15 men a day. Accordingly, the traffic and parade of men – all white between the ages of 25 to 80 years old – coming in and out of the Best Western® Naples was tremendous. Up to 50 to 75 men per week arriving at the Best Western® Naples rooms rented by S.L.

192. This procession of men would have been open an obvious to anyone working at the Best Western® Naples. These sex buyers were not registered guests.

193. While being forcefully raped by hundreds of sex buyers at the Best Western® Naples, A.D. was not allowed to leave the hotel room. Instead, S.L. would arrange buyers and tell them which room to go to.

194. S.L. would stop at the room to collect money multiple times a day after each "rush" of sex buyers.

195. After the continuous two weeks trafficked by S.L., A.D. continued to be trafficked for sex at the Best Western® Naples by N.M.

196. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

197. With N.M., A.D. was forced to rent the rooms at the Best Western® Naples under her name. At N.M.'s direction, A.D. would request two room keys, one key for herself and the other to give to N.M.; however, only her name was registered with the hotel.

198. On many occasions, the Best Western® Naples employees would tell A.D. to rent a

specific room, on a certain floor, near a certain exit way.

199. The room deposit was always paid in cash. When A.D. would check out, a Best Western® Naples employee would do a "room check" where sex paraphernalia, such as used condoms, empty lube bottles, and excessive amounts of dirty towels and linens, was readily visible to the hotel employee conducting the "room check." A.D. would wait at the front desk during the "room check." The Best Western® Naples employee conducting the "room check" would inform the front desk that the room was "all clear," and the cash deposit would be returned to A.D.

200. N.M. developed relationships with several of the Best Western® Naples employees and had illicit arrangements with them to conceal their sex trafficking operation.

201. A.D.'s trafficker, N.M., stayed with A.D. at all times at the Best Western® Naples.

202. A.D. would be instructed to keep her hotel room door open – with lock on the outside – to prevent the door from closing, so that sex buyers could easily identify which room she was staying in.

203. A.D. was raped and otherwise sexually abused hundreds and hundreds of times at the Best Western® Naples.

204. A.D. would be forced by N.M. to perform commercial sex acts with up to 5 to 10 men a day. Accordingly, the traffic and parade of men coming in and out of the Best Western® Naples was tremendous.

205. This procession of men would have been open an obvious to anyone working at the Best Western® Naples. These sex buyers were not registered guests.

206. While being forcefully raped by hundreds of sex buyers at the Best Western® Naples, A.D. was not allowed to leave the hotel room. Instead, N.M. would arrange buyers and tell them which room to go to.

207. The Best Western® Naples security cameras undoubtedly filmed a great deal of this obvious traffic as well as the victim A.D. as she entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of A.D. from occurring on the Best Western® Naples hotel premises.

208. There were numerous different Best Western® Naples employees involved in A.D.'s trafficker's operation. These employees served as lookouts for police.

209. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

    c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

    d. A continuous procession of men entering and leaving A.D.'s room;

    e. Excessive requests for sheets, cleaning supplies, towels, and room service;

    f. The personal relationship between various hotel staff and A.D.'s trafficker; and

    g. The direct employee encounters with A.D. and her trafficker inside the Best Western® Naples.

**The Sex Trafficking of A.D. at the Fairfield Inn and Suites® by Marriott**

210. Plaintiff A.D. was subjugated to sex trafficking at the Fairfield Inn and Suites® by Marriott located at 3804 White Lake Blvd, Naples FL 34117, in approximately July of 2012.

211. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

212. The Fairfield Inn would let them pay for the room in cash, but required a credit card for the room deposit.

213. At the direction of her trafficker, A.D. used her identification to book the rooms and check in.

214. A.D. was trafficked at the Fairfield Inn and Suites® by Marriott at a minimum 5 times a month for approximately 2 nights each stay. Up to 8 to 15 sex buyers per stay arriving at the Fairfield Inn and Suites® by Marriott rooms rented for the purpose of sell A.D. for sex. A.D. was sexually exploited and abused numerous times at the Fairfield Inn and Suites® by Marriott.

215. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

    c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

    d. A continuous procession of men entering and leaving A.D.'s room;

    e. Excessive requests for sheets, cleaning supplies, towels, and room service;

    f. The personal relationship between various hotel staff and A.D.'s trafficker; and

    g. The direct employee encounters with A.D. and her trafficker inside the Fairfield Inn and Suites® by Marriott.

**The Sex Trafficking of A.D. at the SpringHill Suites® by Marriott**

216. Plaintiff A.D. was first subjugated to trafficking at SpringHill Suites® by Marriott located at 3798 White Lake Blvd, Naples, FL 34117, in approximately July of 2012.

126

217. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

218. At the SpringHill Suites, N.M. advertised A.D. on Backpage.com for massages only. At the SpringHill Suites, they were able to dim the lights to set the mood as massage parlor. N.M. charged $150 dollars for a 60-minute massage.

219. The SpringHill Suites would let them pay for the room with cash, but required a credit card for the room deposit.

220. At the direction of her trafficker, A.D. used her identification to book the rooms and check in.

221. A.D. was trafficked at the SpringHill Suites® by Marriott at a minimum 5 times a month for approximately 2 nights each stay. Up to 8 to 15 sex buyers per stay arriving at the SpringHill Suites® by Marriott rooms rented for the purpose of sell A.D. for sex. A.D. was sexually exploited and abused numerous times at the SpringHill Suites® by Marriott.

222. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

    c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

    d. A continuous procession of men entering and leaving A.D.'s room;

    e. Excessive requests for sheets, cleaning supplies, towels, and room service;

    f. The personal relationship between various hotel staff and A.D.'s trafficker; and

g. The direct employee encounters with A.D. and her trafficker inside the SpringHill Suites® by Marriott.

**The Sex Trafficking of A.D. at Conty's Motel Naples**

223. Plaintiff A.D. was first subjugated to sex trafficking at Conty's Motel Naples ("Conty's"), located at 11238 Tamiami Trail E, Naples, FL 34113 in August of 2012.

224. N.M. advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

225. At the direction of N.M., A.D. rented rooms and Conty's under her name with cash. A.D. paid for the room nightly and in the morning, A.D. would request to extend her stay for another night.

226. A.D. was trafficked in the same room at Conty's between approximately 10 to 14 days.

227. At check-in and at the direction of N.M., A.D. would request two keys despite being the only registered guest with the hotel—one for N.M. and one for her.

228. A.D.'s room was directly across from the front office. The office had a clear view of her room and could see a significant amount of sex buyers coming and leaving her room, including N.M., who stayed with her when she was not with a buyer.

229. A.D. was forced to perform commercial sex acts in the room at Conty's. Accordingly, the traffic and parade of men coming in and out of her room was tremendous. This procession of unregistered male guests would have been open and obvious to anyone working at Conty's.

230. While A.D. was raped in the room at Conty's, N.M. would sit and wait outside by the pool.

231. When A.D. would check out, a Conty's employee would do a "room check" where sex

paraphernalia, such as used condoms, empty lube bottles, and excessive amounts of dirty towels and linens, was readily visible to the motel employee conducting the "room check." A.D. would be handed an envelope with cash.

232. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

    c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

    d. A continuous procession of men entering and leaving A.D.'s room;

    e. Excessive requests for sheets, cleaning supplies, towels, and room service;

    f. The personal relationship between various hotel staff and A.D.'s trafficker; and

    g. The direct employee encounters with A.D. and her trafficker inside the Conty's Motel Naples.

**F. THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.D.**

233. Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of A.D. The Defendants leased rooms to A.D.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.D. to repeated exploitation as he forced her into sexual servitude.

234. Defendants knew, or should have known, that A.D. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.D.'s trafficker frequented the Defendants' hotels.

235. Defendants knew, or should have known, that A.D. was being trafficked because A.D. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotels for his illegal sex trafficking activities.

236. Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor A.D. while he was trafficking her.

237. Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided and participated with A.D.'s trafficker with his criminal activity. The Defendants took no action as A.D. repeatedly visited the hotels, often with different guests, avoiding eye contact, and dressing inappropriately for the weather.

238. The Defendants all had the opportunity to stop A.D.'s trafficker and offenders like him from victimizing A.D. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

239. The Defendants all financially benefited from the sex trafficking of A.D., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

240. Defendants benefit from the steady stream of income that sex traffickers bring to their hotel brands.

241. Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

242. Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted

access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

243. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

244. Defendants maintained their deficiencies to maximize profits by:

    a. Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b. Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

    c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

    d. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity

measures to actively combat human trafficking and sexual exploitation.

245. As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, A.D. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**
**A.      COUNT ONE – 18 U.S.C §1595 ("TVPRA")**
**(Against all Defendants)**

246. The Plaintiff A.D. incorporates each foregoing allegation.

247. A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

248. The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in a venture which facilitated the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

249. The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.D. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.D.'s injuries and damages.

250. A.D. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C.

§1591(a).

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

    a. past and future emotional distress;

    b. consequential and/or special damages;

    c. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    d. disgorgement of profits obtained through unjust enrichment;

    e. restitution;

    f. punitive damages with respect to each cause of action;

    g. reasonable and recoverable attorneys' fees;

    h. costs of this action; and

    i. pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs,

and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: May 4, 2022

**RESPECTFULLY SUBMITTED,**

*/s/ Kathryn L. Avila*
**Kathryn L. Avila**
Fla. Bar No. 1019574
**Emmie Paulos**
Fla. Bar No. 99010
Carissa Phelps (*pro hac vice* forthcoming)
LEVIN PAPANTONIO RAFFERTY
PROCTOR BUCHANAN O'BRIEN BARR
MOUGEY P.A.
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850-436-6246
F: 850-436-6271
E: kavila@levinlaw.com /
epaulos@levinlaw.com

***Attorneys for Plaintiff***
